[No. B179751. Second Dist., Div. Eight. May 18, 2006.]

In re the Marriage of JANET E. and RONALD W. BURKLE.
JANET E. BURKLE, Appellant, v.
RONALD W. BURKLE, Respondent.

Counsel

Philip Kaufler, Hugh John Gibson and Hillel Chodos for Appellant.

Wasser, Cooperman & Carter, Dennis M. Wasser, Bruce E. Cooperman; Greines, Martin, Stein & Richland, Irving H. Greines; Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro and Patricia L. Glaser for Respondent.

Opinion

**BOLAND, J.—**

## SUMMARY

The issue in this case is the enforceability of a postmarital agreement. We affirm the trial court's order finding the agreement valid and enforceable. Our conclusions are:

—A presumption of undue influence does not arise in an interspousal transaction unless one spouse obtains an unfair advantage or obtains property for which no or clearly inadequate consideration has been given. The presumption does not apply to a postmarital agreement in which both spouses obtain advantages; both are represented by independent and competent legal counsel; the wife is offered full access to the husband's business records relating to the marital assets; and both spouses acknowledge in the agreement that neither has obtained any unfair advantage as a result of the agreement.

—Even if a presumption of undue influence applied to the parties' postmarital agreement and the trial court erred in allocating to the wife the burden of proving the agreement was invalid, substantial evidence supported the trial court's finding that the credible evidence "established overwhelmingly" that the agreement was not procured by undue influence.

—The wife's claim that the postmarital agreement was procured by the husband through actual fraud, by reason of his failure to provide written information to her on the effects of a prospective merger that would later affect the value of marital assets, is without merit.

—Family Code sections 2104 and 2105, requiring parties to a marital dissolution action to serve preliminary and final verified declarations disclosing all assets and liabilities, do not apply to spouses who negotiate and execute a postmarital agreement while a dissolution proceeding is in abeyance, and the spouses are attempting to reconcile rather than contemplating the imminent dissolution of the marriage.

—The wife's claim that she properly rescinded the postmarital agreement for "non-performance and failure of consideration" is without merit, because the wife repudiated the agreement in her dissolution petition, excusing further performance by the husband pending judicial determination of the validity of the agreement.

—The doctrines of ratification and estoppel preclude the wife from claiming the postmarital agreement is unenforceable.

## FACTUAL AND PROCEDURAL BACKGROUND

Ronald W. Burkle and Janet E. Burkle were married on March 23, 1974. In April 1997, Ms. Burkle hired a personal attorney who assisted her in interviewing and obtaining family law counsel. In May, Ms. Burkle retained Barry T. Harlan, a certified family law specialist with more than 30 years of legal experience, and in June 1997 she filed a petition for dissolution of the marriage. Ms. Burkle was also advised by two other certified family law specialists, as well as by other lawyers in Harlan's firm with expertise in tax law, real estate law and other areas. She engaged forensic accountants (Gursey, Schneider & Co.) and hired a private investigative firm. After Ms. Burkle's petition was filed, Mr. Burkle engaged David S. Karton to represent him in the dissolution proceeding.

The marriage did not proceed to dissolution in 1997. Instead, by August 1997, both parties were seriously considering an effort to reconcile, coupled with a postmarital agreement that would resolve all present and future financial issues between them. The parties resumed living together in September 1997, and executed a postmarital agreement in November 1997. According to Ms. Burkle, they lived together until April 2002. On June 13, 2003, Ms. Burkle filed the current petition for dissolution of marriage, in which she contends the postmarital agreement is void and unenforceable.

We first describe the postmarital agreement, and then turn to the events surrounding its execution and the subsequent proceedings leading to this appeal, including the relevant findings and conclusions of the trial court.

I. *The postmarital agreement.*

In broad strokes, the significant financial effects of the agreement executed by the Burkles in November 1997 were these:

—Schedules were prepared by Mr. Burkle listing and valuing community property assets (Schedule A) and assets he claimed as separate property (Schedule C), as of June 6, 1997. As to these schedules:

> —The community property schedule showed property with a tax-effected fair market value of $60,028,267.

> —The property listed as separate was acquired during a five-year period between 1992 and 1997, during which Mr. Burkle contended the parties had lived separate and apart (a contention disputed by Ms. Burkle), and was valued at a tax-effected fair market value of $86,755,898.[1]

—All appreciation and income from the community property accruing from the date of the agreement were to be Mr. Burkle's separate property.

—Mr. Burkle was to pay Ms. Burkle, on the anniversary date of the agreement for every year (or pro rata portion) the parties lived together, $1 million in cash or negotiable securities, deemed her distributive share of the appreciation and income from community assets for the preceding year, and considered her separate property upon receipt.

—If either party sought a dissolution of the marriage, or elected a division of the community property, then:

> —Mr. Burkle would be awarded, as his share of the community assets, all the assets on the community property schedule and/or all assets acquired with any proceeds derived from those assets.

> —Ms. Burkle would be awarded, as her share of the community assets, in cash and tax free, $30,014,134 (50 percent of the total net value as of the date of the agreement, adjusted for liabilities and tax consequences), plus 5 percent simple interest per annum

---

[1] This separate property consisted of stock and stock warrants in Smith's and Dominick's, held by various limited and general partnerships and limited liability corporations. A third schedule listed Ms. Burkle's separate property, principally personal effects, furniture, automobiles and several horses.

accruing from the date of the agreement. Of this amount, Mr. Burkle would pay Ms. Burkle (a) $5 million within 90 days of service of a petition for dissolution (or written notice of an election to divide the community property); (b) $5 million with 90 days after the first payment; and (c) $10 million on each annual anniversary date of the second $5 million payment, until paid in full.

—Mr. Burkle was given sole management and control over all community property as if it were his separate property, with no duty to account for the community assets so long as he made the agreed annual million-dollar payments to Ms. Burkle.

—If either party sought a dissolution of the marriage or elected a division of community property, Mr. Burkle was to purchase a residence for Ms. Burkle, selected by her, provided the residence was within three miles of the residence in which the parties were then living. The cost was to be the amount necessary to purchase a residence valued at up to $3 million as of June 1997.

—Mr. Burkle was obligated to pay all family living expenses, described as "all expenses necessary to maintain the Parties and the Parties' minor children in a lifestyle consistent with that which each of them has maintained while living separate and apart during the last five (5) years." The agreement recited that Mr. Burkle had paid, as Ms. Burkle's marital living expenses during that period, an amount between $400,000 and $500,000 per year, net of taxes, an amount Ms. Burkle acknowledged had "more than adequately maintained her in her desired lifestyle."

—Ms. Burkle waived any rights to spousal support.

The postmarital agreement was initially drafted in August 1997, and was signed by Ms. Burkle on November 5, 1997 and by Mr. Burkle on November 21, 1997. The parties initialed each page of the agreement. It was also signed by Harlan, Ms. Burkle's attorney, who certified that he had fully explained to Ms. Burkle the effect the agreement had upon the rights she would otherwise have as a matter of law, and that she acknowledged to him that she understood the legal effect of the agreement. The agreement included a statement of intent and other recitals and provisions, including the following:

—Ms. Burkle desired financial security and assurance she would be able to enjoy her present lifestyle without hindrance or risk of loss.[2]

—Mr. Burkle desired the financial freedom to make investments that could yield high returns but which carried the risk of significant loss.

—If the parties were ultimately unable to reconcile their differences and either of them desired to dissolve the marriage, both parties wanted the agreement to fully resolve all possible financial issues so they would be spared the financial and emotional costs of litigation.

—The parties had been living separate and apart for approximately five years. They disputed the legal effect of their separate residences, and acknowledged the dispute would create a substantial difference in the value of the community estate, depending on which party prevailed.

—The parties acknowledged that:

 —They discussed with their respective legal counsel, "at length, numerous alternatives available with respect to the form and substance of a postmarital agreement, and that they have adopted the provisions of this agreement after careful consideration of such available alternatives."

 —They were aware that the assets on Schedules A and C "may, and probably will, increase dramatically in value in the future and that Jan's interest therein is being fixed at this time, notwithstanding the possibility of future increases."

 —They had the right to conduct formal discovery in the dissolution proceeding, and voluntarily elected to forgo such discovery.

 —They did not rely on any statement, warranty or representation of the other party, except as stated in the agreement, "as being a representation upon which reliance was based in agreeing to" the postmarital agreement.

 —Neither party had obtained any unfair advantage as a result of the agreement.

---

[2] Elsewhere, the agreement recited that "the most significant factors and critical elements for Jan in entering into this Agreement are that it provides her with liquidity and predictability and reduces her risk of potential loss."

—No presumption concerning the fiduciary duty owed by one spouse to another (Fam. Code, §§ 721 & 1100) would be applicable to the agreement, and the benefits of any such presumptions were waived.

—Ms. Burkle acknowledged that her attorneys and accountants "have had a minimum of six (6) months to conduct independent investigations, analysis and review of transactions in order to determine the extent and value of all assets and liabilities of the Parties."

—The parties agreed, as to the disclosure of assets, that:

—The purpose of the disclosure schedules was "to identify the assets and liabilities of the Parties as accurately as possible in order to arrive at an equitable, mutually agreeable division of these assets . . . ."

—Mr. Burkle had made "a good faith estimate of what he believes to be the reasonable value" of the assets on Schedules A and C, and that the notes to those schedules further amplified the assumptions on which his estimates were premised.

—Ms. Burkle acknowledged she had had "the opportunity to do as much independent discovery, appraisal and valuation of the assets . . . as she wishes and that she has not relied on the word of Ron in determining the value of the assets set forth therein."

—The parties were aware of the rights and duties of a spouse exercising unilateral management and control of community assets under the Family Code (Fam. Code, § 1100 et seq.), and waived those provisions, specifically stating that: "It is understood that for the purposes of negotiating and preparing this Agreement, Jan is not acting as a fiduciary for Ron and Ron is not acting as a fiduciary for Jan."

—The parties understood there is a substantial issue under California law as to whether public policy allowed them to contract for a release of their fiduciary responsibilities to each other, and nonetheless voluntarily did so.

## II. *Subsequent events and proceedings.*

As mentioned *ante*, the parties lived together for more than four years after executing the agreement, until (according to Ms. Burkle) April 2002. In June

2003, Ms. Burkle filed a petition for dissolution of the marriage in which she asserted the agreement was void and unenforceable. The parties stipulated to the appointment of Retired Judge Stephen M. Lachs, as a privately compensated judge pro tempore, to hear and determine all disputes arising from the postmarital agreement, including its validity and enforceability. Judge Lachs was also charged with resolving all other issues arising from the marital relationship, including child custody, child and spousal support, property rights, and so on. The parties stipulated that an evidentiary hearing focusing on the validity and enforceability of the postmarital agreement would constitute a bifurcated trial on that issue.

Ms. Burkle sought to compel extensive discovery—which she had forgone when the postmarital agreement was in negotiation—to determine whether the financial and property disclosures and valuations in the schedules to the postmarital agreement were "truthful or fraudulent." The court, however, declined to compel any discovery concerning the assets and liabilities identified on the schedules, limiting discovery—at this stage of the proceeding—to the circumstances surrounding the entry into the agreement.[3] The court observed that: "If it turns out that the circumstances surrounding the entry into the agreement are such that it appears that Ms. Burkle was taken advantage of, then it may very well be that she is entitled to further discovery."

A 10-day trial ensued, at which Ms. Burkle raised two principal issues: (1) whether she was so depressed and emotionally dependent upon Mr. Burkle that she did not sign the agreement of her own free will, and (2) whether Mr. Burkle concealed assets or significant financial information from Ms. Burkle. The principal component involved in the second issue was Ms. Burkle's complaint that the schedules to the agreement did not mention two mergers Mr. Burkle was negotiating during the period between June 1997 and November 1997, which transformed his two major business assets from privately held regional supermarket chains to publicly merged national supermarket chains. These mergers were:

1) A merger between Smith's (holdings in which Mr. Burkle claimed as separate property) and Fred Meyer, which was announced publicly in May

---

[3] The court elaborated: "What representations were made, if Ms. Burkle wants to bring in the lawyers and accountants who represented her, that's her decision. If she wants to do discovery as to the representations made to her from Mr. Burkle and his entourage, legal and financial, certainly she is entitled [to] do that, as to what representations were made. [¶] She is entitled to do discovery as to, in my opinion, the reasons that things happened the way they did, and why is it that she received only these documents and not the other documents."

1997 and was consummated on September 9, 1997, almost two months before Ms. Burkle signed the agreement; and

2) A later, second merger between Food-4-Less/Ralphs (a community property holding) and Fred Meyer/Hughes, which was announced publicly on November 6, 1997, the day after Ms. Burkle signed the postmarital agreement (and two weeks before Mr. Burkle signed it), and which was consummated four months later, on March 10, 1998.

Ms. Burkle also asserted that, when the second merger closed in March 1998, Mr. Burkle obtained valuable benefits (though the community's interest in various "Yucaipa" companies) that had not been disclosed to Ms. Burkle before she signed the agreement. These benefits were 75 percent of a $20 million management contract termination fee, and 75 percent of $14 million in Fred Meyer shares, received in return for surrender of Yucaipa warrants.

Both of the Burkles testified at length at the hearing, as did Karton (Mr. Burkle's lawyer) and several other witnesses, and more than 70 exhibits were offered into evidence.[4] The trial court's ultimate findings were that Ms. Burkle signed the agreement "freely and voluntarily, and free from any emotional influence that interfered with an exercise of her own free will," and that Mr. Burkle did not conceal assets or significant financial information from Ms. Burkle. We summarize *post*, in two categories roughly corresponding to the court's two ultimate conclusions and in a third general category, various of the court's findings, all of which are supported by substantial evidence in the record.

A. *The undue influence issue.*

With respect to its conclusion that Ms. Burkle signed the agreement freely and voluntarily, the trial court found, inter alia:

—In June 1997, Mr. Burkle transferred $100,000 into a bank account in Ms. Burkle's name so she would feel no financial pressure, and Ms. Burkle testified that she felt no financial pressure during the period culminating in the execution of the agreement.

—In a conversation in which Mr. Burkle first made reference to a sum Ms. Burkle might receive under a postmarital agreement, Ms. Burkle told

---

[4] The other witnesses were Donald L. Gursey (of the forensic accounting firm), Melinda Wade (a friend of the Burkles), and Naoma Nicholls (Mr. Burkle's assistant).

Mr. Burkle she did not feel comfortable discussing financial issues with him directly. Thereafter, the parties did not discuss between themselves the substantive provisions of the proposed postmarital agreement.

—Both parties genuinely wanted to reconcile with each other.

—Ms. Burkle's written and oral statements evidenced that she was in full control of her faculties and emotions in connection with the negotiation of and her entry into the agreement.

—Mr. Burkle did not coerce or threaten Ms. Burkle in any way, "including physically, emotionally, or economically, to get her to sign the Agreement," and no persuasive evidence supported a conclusion she entered into the agreement as a result of a depressed mental condition.

—Mr. Burkle made all relevant financial information available to Ms. Burkle's attorneys and accountants for their inspection and review, and Ms. Burkle was free at all times to have her representatives review and investigate that information. Her decisions regarding the scope and extent of investigations, including her decision to limit the scope, were freely made, with the advice of her attorneys, and not as the result of any pressure applied by Mr. Burkle.

—Ms. Burkle exercised her own judgment, with the advice of skilled attorneys, to conclude that the agreement was satisfactory to her.

—Ms. Burkle, "did, in fact, enter into the Agreement freely, willingly and voluntarily, and free of any fraud, duress, medical condition or undue influence."

B. *The concealment issue.*

With respect to the claim that Mr. Burkle concealed assets and significant financial information from Ms. Burkle, the trial court further found, inter alia:

—On August 22, 1997, Karton (Mr. Burkle's lawyer) sent the initial draft of the proposed agreement to Harlan, including Schedules A and C setting forth Mr. Burkle's view of the parties' community and Mr. Burkle's separate property. In Karton's letter forwarding the draft, he advised Harlan that: "With regard to the financial information, it appears more sensible to provide you with access and information as you request. When you are ready to proceed in that regard, let me know, and we will arrange a meeting at Ron's office, together with personnel to assist you in reviewing the documentation."

—Karton's offer to make all information available to Ms. Burkle's representatives remained open until the agreement was executed.

—On September 6, 1997, the Burkles and their respective counsel met for a substantial portion of the day to discuss the initial draft. Two days later, Harlan advised Karton that Ms. Burkle was prepared to accept the basic terms of the proposed agreement. Negotiations continued, however, until late October. On October 27, 1997, at Harlan's request, Karton sent him four execution-ready copies of the agreement, and Ms. Burkle subsequently met for two hours with Harlan and two other of her attorneys to discuss the agreement.

—Mr. Burkle fulfilled his fiduciary duties to Ms. Burkle, "including his duty to make a true and full disclosure of community assets," and he "did disclose in good faith his sincerely held and reasonable estimates of the value and characterization of the community property and his separate property."

—The merger between Smith's and Fred Meyer (the first merger, consummated on September 9, 1997 and involving property Mr. Burkle claimed as separate) was known to Ms. Burkle before she entered into the agreement.

—At the meeting of the parties and counsel on September 6, 1997, Mr. Burkle discussed with Ms. Burkle and Harlan the possibility of a merger between Food-4-Less/Ralphs and Fred Meyer/Hughes (the second merger). And, Harlan subsequently referred to a possible merger in his September 16, 1997 memorandum to Karton: "[I]t seems to me from a fairness point of view that if there is a great increase in the value of the community property assets, that Jan should share in the appreciation in a defined amount. . . . [¶] I would propose that if for example, Ralphs was to merge with Hughes and go public and the value skyrockets to several hundred millions, that Jan should share in this appreciation. I will let you and your client determine what is a fair and equitable defined, ascertainable amount."[5]

—"[M]any of the issues raised by [Ms. Burkle] and her counsel at time of trial regarding purported inadequacies in disclosure could or should readily have been discovered and addressed prior to the parties' entry into the

[5] The trial court expanded on the point: "This reference [in Harlan's memorandum] was not by chance. [Ms. Burkle's] failure to call Mr. Harlan to testify regarding this matter at trial further supports the Court's finding that such possible merger was disclosed by [Mr. Burkle] to [Ms. Burkle]. Furthermore, the merger between Food-4-Less and Fred Meyer Co., was publicly announced on November 6, 1997, and [Mr. Burkle] did not execute the Agreement until November 22, 1997. Yet, despite exchanges of correspondence and telephone calls between Mr. Harlan and Mr. Karton during that 16-day period, at no time . . . did Mr. Harlan request a change in the Agreement as a result of the publicly-announced merger."

Agreement in 1997 if [Ms. Burkle] and her counsel had reviewed the information which [Mr. Burkle] made available to them, including, but not limited to, information regarding the Yucaipa warrants and the management agreement cancellation fee."

—The overall value of the assets on the community property schedule to the postmarital agreement did not materially change between June 6, 1997 (the agreed valuation date), and November 22, 1997 (the date of the agreement).

C. *Other pertinent findings.*

The trial court made several other pertinent findings and conclusions, including these:

—Ms. Burkle was represented by a host of attorneys, including three certified family law specialists, throughout the process that culminated with the execution of the agreement. She also engaged a preeminent forensic accounting firm, and hired a private investigative firm to conduct an asset search on her behalf.[6] The investigative firm provided a three-volume report to Ms. Burkle's attorneys. Ms. Burkle asserted the attorney-client and work product privileges as to the advice and information provided by her attorneys, accountants and investigators.[7]

—Under the postmarital agreement, Ms. Burkle "in fact obtained the advantage she was bargaining for of financial security;" and no presumption of undue influence arose by virtue of the parties' entry into the agreement.

—"Even if a presumption of undue influence had arisen . . . the credible evidence at trial established overwhelmingly that any such presumption would have been fully and completely rebutted."

—Ms. Burkle accepted the benefits she received under the agreement for more than five years before raising claims relating to the second merger. "The Court finds that such a delay in raising that issue was unreasonable, and that, by her conduct, [Ms. Burkle] ratified the Agreement and is estopped to deny the validity and enforceability of the Agreement at this late juncture."

—"The doctrine of laches bars [Ms. Burkle] from contesting the validity and enforceability of the Agreement on the basis of the circumstances

---

[6] The forensic accounting firm, Gursey, Schneider & Co., performed comparatively minor services, preparing a cash flow report and billing $4,552.50 through July 31, 1997. However, as of August 28, 1997, the firm continued ready, willing and able to do further work, had it been assigned.

[7] The trial court's statement of decision states that the court drew no inference from Ms. Burkle's assertion of these privileges.

surrounding its negotiation and execution, its performance, and the long delay in raising challenge to the Agreement."

After the trial court issued its tentative decision, Ms. Burkle timely requested a statement of decision. She filed objections to the proposed statement of decision; various revisions were made; and the objections were overruled. A final statement of decision was filed on December 9, 2004, together with an order finding the agreement valid and enforceable and certifying the order for immediate appellate review. This appeal followed.

## DISCUSSION

Ms. Burkle's challenge to the trial court's decision is premised upon several mistaken legal contentions, which we address in succeeding sections of this opinion.

First, Ms. Burkle ignores the substantial evidence rule, reciting the facts as she thinks they should have been found rather than as the trial court found them. The substantial evidence rule does not apply, she contends, because the court misallocated the burden of proof, an error she claims is "reversible error *per se* . . . ." We conclude in part I, *post*, that the court properly applied the burden of proof, and that no presumption of undue influence applied under the circumstances of this case. We further conclude in part II, *post*, that, even if a presumption of undue influence arose, the evidence revealed it was thoroughly rebutted, and no legal basis exists for reversing the court's order.

Second, we reject in part III, *post*, Ms. Burkle's claim that, because Mr. Burkle did not provide her with written information about the mergers in progress during the negotiation of the postmarital agreement, the agreement was procured "through actual fraudulent misrepresentation and concealment" as a matter of law.

Third, Ms. Burkle erroneously asserts the agreement must be set aside for failure to comply with Family Code section 2100 et seq., which require parties to a dissolution proceeding to serve on each other financial disclosure declarations before or at the time of an agreement resolving property or support issues. As we explain in part IV, *post*, those sections do not apply to a postmarital agreement that was not executed in contemplation of the imminent dissolution of the marriage.

Fourth, we reject Ms. Burkle's claim that she properly rescinded the agreement on January 7, 2004 for failure of consideration, based on Mr. Burkle's allegedly defective tender of payment under the agreement. We conclude in part V, *post*, that Ms. Burkle unequivocally repudiated the

agreement in her petition for dissolution and her verified responses to interrogatories, excusing any further performance by Mr. Burkle pending a judicial determination of the validity of the agreement.

Finally, as a further ground supporting the trial court's order, we conclude in part VI, *post*, that the doctrines of ratification and estoppel preclude Ms. Burkle's challenge to the validity of the agreement.

I. *No presumption of undue influence arose from the execution of the Burkles' postmarital agreement, and the trial court therefore did not err in assigning the burden of proof to Ms. Burkle.*

We begin with a brief discussion of several principles that generally apply to the analysis of interspousal transactions.

First, the fiduciary relationship between husband and wife is expressly described in Family Code section 721, particularly as it relates to transactions between themselves. The spouses occupy a confidential relationship with each other, and are subject to the general rules governing fiduciary relationships: "This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners . . . ." (Fam. Code, § 721, subd. (b).)

Second, "whenever [spouses] enter into an agreement in which one party gains an advantage, the advantaged party bears the burden of demonstrating that the agreement was not obtained through undue influence . . . ." (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 27 [99 Cal.Rptr.2d 252, 5 P.3d 815] (*Bonds*); see *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293 [39 Cal.Rptr.2d 673] (*Haines*).)[8]

From these two settled principles, Ms. Burkle concludes that her postmarital agreement was presumptively obtained through undue influence, and that Mr. Burkle had the burden of demonstrating otherwise. Ms. Burkle contends that "even a cursory reading" of the agreement shows that Mr. Burkle "obtained many advantages over Jan by virtue of the postmarital agreement."

---

[8] The Supreme Court explains: "The primary consequences of designating a relationship as fiduciary in nature are that the parties owe a duty of full disclosure, and that a presumption arises that a party who owes a fiduciary duty, and who secures a benefit through an agreement, has done so through undue influence. . . . It has long been the rule that '[w]hen an interspousal transaction advantages one spouse, "[t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence." ' " (*Bonds, supra,* 24 Cal.4th at pp. 27–28, citations omitted.)

According to Ms. Burkle, if the spouse relying on a marital agreement obtained any advantage from it, fair or unfair, the presumption of undue influence arises, and any advantage obtained by the spouse challenging the agreement is "completely irrelevant." We do not agree with Ms. Burkle's analysis, which is inconsistent with the express language of Family Code section 721 and with the applicable case law.

### A. The meaning of "advantage" in a marital transaction.

■ It is settled that the predicate for applying a presumption of undue influence in an interspousal transaction is that one spouse has obtained an advantage over the other in the transaction. (*Haines, supra,* 33 Cal.App.4th at p. 297; see *Bonds, supra,* 24 Cal.4th at p. 27.) The presumption of undue influence is regularly applied in marital transactions in which one spouse has deeded property to the other, as in *Haines.* In such cases, it is evident one spouse has obtained an advantage—the deeded property—from the other. In other more comprehensive marital transactions involving the division of community assets, the nature of the "advantage" required to raise a presumption of undue influence has not been much discussed in the cases. However, the language of Family Code section 721 is clear, prohibiting either spouse from taking "any unfair advantage of the other." (Fam. Code, § 721, subd. (b).) Section 721, together with our analysis of the case authorities, leads us to conclude that the "advantage" which raises a presumption of undue influence in a marital transaction involving a contractual exchange between spouses must necessarily be an unfair advantage.

As long ago as 1894, the Supreme Court stated that: "The moment it appears . . . that 'an unfair advantage' has been obtained, the presumption that it was procured by undue influence arises out of the existence of the confidential relation of husband and wife . . . ." (*Dimond v. Sanderson* (1894) 103 Cal. 97, 102 [37 P. 189] (*Dimond*).) Almost a century later, the principle of unfair advantage was codified by the predecessor to Family Code section 721 (former Civil Code section 5103), which expressly defines the fiduciary duties of spouses in transactions with each other. The existence of unfair advantage—or lack of consideration—as a predicate to the presumption of undue influence in a marital transaction has been frequently suggested in precedents over the years, both before and after the enactment of section 721 and its predecessor. Thus:

—In *Estate of Cover* (1922) 188 Cal. 133, 144 [204 P. 583] (*Cover*), the Supreme Court said that the "mere existence of the marriage relation alone will not, in and of itself, suffice to initiate and support the presumption of undue influence where the transaction between husband and wife is *prima facie,* or, from all of the circumstances thereof, shown to be fair and free from any material advantage to the husband from and over the wife."

—In *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 88 [260 Cal.Rptr. 403], the court observed: "The marriage relationship alone will not support a presumption of undue influence by one spouse over the other where the transaction between them is shown to be fair."

—In *Haines, supra,* 33 Cal.App.4th 277, the court expressly stated that the presumption of undue influence arises under Family Code section 721 "[w]here one spouse has taken advantage of another" in the transaction. (*Haines,* at p. 301.) The word "advantage," in this context, plainly does not mean merely that a gain or benefit has been obtained. Taking "advantage of another" necessarily connotes an unfair advantage, not merely a gain or benefit obtained in a mutual exchange.

—*In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, 996 [4 Cal.Rptr.3d 378] (*Delaney*) stated that "when any interspousal transaction advantages one spouse to the disadvantage of the other, the presumption arises that such transaction was the result of undue influence." Again, a mere benefit is not enough; the advantage must operate "to the disadvantage" of the other spouse.

—In *In re Marriage of Saslow* (1985) 40 Cal.3d 848 [221 Cal.Rptr. 546, 710 P.2d 346], the Supreme Court, while it did not discuss the presumption issue, likewise emphasized the necessity for a showing of unfairness: "To support a finding of undue influence, '[the] evidence, in addition to a showing of marriage relationship, must also show such unfairness of the transaction as will tend to establish that the wrongful spouse made use of the confidence reposed for the purpose of gaining an unreasonable advantage over the mate.' " (*Id.* at pp. 863–864, quoting *Snyder v. Snyder* (1951) 102 Cal.App.2d 489, 492 [227 P.2d 847].)

—Finally, numerous cases apply the presumption of undue influence when the marital transaction is one in which one spouse deeds his or her interest in community property to the other spouse, for no consideration or for clearly inadequate consideration. (E.g., *Weil v. Weil* (1951) 37 Cal.2d 770, 787–789 [236 P.2d 159] [husband who secures a property advantage from his wife has the burden to show the absence of undue influence; wife's deed to husband was voluntary where the wife was aware that the spouses' interests were in conflict and she had ample opportunity to obtain independent advice].) Cases such as *Weil* and *Haines,* involving property transfers without consideration, necessarily raise a presumption of undue influence, because one spouse obtains a benefit at the expense of the other, who receives nothing in return. The advantage obtained in these cases, too, may be reasonably characterized as a species of unfair advantage.

In short, both Family Code section 721 and case precedents support the conclusion that in a contractual exchange between spouses, a presumption of undue influence arises only if one of the spouses has obtained an *unfair* advantage over the other. The Supreme Court's language in *Bonds*—that the advantaged spouse bears the burden of demonstrating that the agreement was not obtained through undue influence—is in no way inconsistent with this conclusion. *Bonds* involved a premarital agreement and, in its discussion contrasting premarital agreements with marital settlement agreements, expressly posits a transaction which "advantages one spouse" (*Bonds, supra*, 24 Cal.4th at p. 28)—not a transaction in which both spouses obtain advantages. *Bonds* had no occasion to elucidate the meaning of "advantage" in a contractual exchange between spouses where both spouses obtain different advantages from the agreement. We discern no incongruity between *Bonds* and our conclusion that a spouse is presumed to have induced a transaction through undue influence only if he or she, in the words of Family Code section 721, has obtained an "unfair advantage" from the transaction.

Ms. Burkle insists that *Bradner v. Vasquez* (1954) 43 Cal.2d 147 [272 P.2d 11] (*Bradner*) requires the conclusion that any advantage, fair or unfair, obtained in a marital agreement is sufficient to generate a presumption that the agreement was induced through undue influence. We disagree. In *Bradner*, the Supreme Court did conclude that, in an action between a fiduciary and his beneficiary, a statutory presumption of undue influence applies when the fiduciary "gains, benefits, or profits" from the transaction, without regard to whether the advantage gained is fair or unfair. (*Id.* at p. 152.) In *Bradner*, the Supreme Court construed the presumptions in Civil Code section 2235 (now Probate Code section 16004). Section 2235 then provided that all transactions between a trustee and his beneficiary, by which the trustee obtains "any advantage" from his beneficiary, were presumed to be entered into by the beneficiary " 'without sufficient consideration, and under undue influence.' "[9] (*Bradner, supra*, 43 Cal.2d at p. 151, quoting former Civ. Code, § 2235.) *Bradner*, which involved a transaction between attorney and client, expressly rejected the proposition that the advantage gained by the fiduciary "must be an unfair advantage before the presumptions of [former Civil Code] section 2235 are properly in the case." (43 Cal.2d at p. 151.) The court found "no language in this section which imposes such an additional requirement." (*Ibid.*) It concluded that where a fiduciary "gains, benefits, or profits" from a transaction with a beneficiary, it may fairly be said that an advantage has been obtained. Further: "To declare that the advantage obtained must be shown to be unfair, unjust, or inequitable before the presumptions arise would

---

[9] Probate Code section 16004, the successor to former Civil Code section 2235, now provides in pertinent part: "A transaction between the trustee and a beneficiary . . . by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties." (Prob. Code, § 16004, subd. (c).)

result in the imposition of a condition which is not required by section 2235." (*Id.* at p. 152.) Similarly, the Supreme Court in *Rader v. Thrasher* (1962) 57 Cal.2d 244 [18 Cal.Rptr. 736, 368 P.2d 360] (*Rader*)—which, like *Bradner*, involved an attorney-client transaction—stated that proof of an advantage, not an unfair advantage, was "sufficient to raise the presumption of insufficient consideration under section 2235," and expressly disapproved "[a]ny language in *Dimond v. Sanderson* [and two other cases] inconsistent with this Conclusion . . . ."[10] (*Rader, supra,* 57 Cal.2d at p. 252.)

In our view, neither *Bradner* nor *Rader* is controlling. Both construed a different statute governing the trustee-beneficiary relationship (former Civ. Code, § 2235), and that statute required a presumption of undue influence if "any advantage" was obtained by the trustee from his beneficiary. The fiduciary duties of spouses are now expressly controlled by Family Code section 721, which prohibits a spouse from taking "any unfair advantage" of the other. Moreover, while principles governing trustee-beneficiary relationships are obviously similar to those governing marital relationships, in that both are fiduciary in nature, the two relationships are not identical. *Dimond* long ago identified a significant difference, namely that the statutory requirements applicable to the one-way trustee-beneficiary relationship do not necessarily apply to an interspousal transaction in which fiduciary duties run in both directions. Indeed, *Dimond* expressly stated that the marital relationship is not that of trustee and beneficiary: "The relation of husband and wife is not that of trustee and beneficiary, though it is a confidential relation, and transactions between them are to be considered in the same light and controlled by the same general rules . . . ; but whether any particular transaction between husband and wife creates a trust, and, if so, which is the trustee and which the beneficiary, must depend upon the facts of the particular transaction involved in the controversy." (*Dimond, supra,* 103 Cal. at p. 101.)

In sum, the precedents construing statutory requirements applicable to transactions between trustees and their beneficiaries are not controlling in interspousal transactions. Interspousal transactions are expressly governed by Family Code section 721, subdivision (b), which prohibits a spouse from taking "any unfair advantage of the other," and treats the fiduciary duties of spouses like those of business partners. The distinction between the two types of fiduciary relationship—trustee-beneficiary on the one hand, and spouses or business partners on the other—is entirely reasonable, because in the latter fiduciary duties run in both directions. Indeed, just as it would be patently

---

[10] In *Dimond,* the Supreme Court took the view, disapproved in *Rader, supra,* 57 Cal.2d at page 252, that the presumption of undue influence in a spousal transaction "cannot appear until the presumption of a sufficient consideration, arising from the written obligation, has been overcome by proof." (*Dimond, supra,* 103 Cal. at p. 102.)

irrational to presume undue influence in a contract between business partners, it would likewise be unreasonable to presume undue influence in a contract between spouses, unless one of the spouses has obtained an unfair advantage. For these reasons, we conclude that a contract between spouses that "advantages one spouse" (*Bonds, supra,* 24 Cal.4th at p. 28), and therefore raises a presumption the transaction was induced by undue influence, is a transaction in which one spouse obtains an unfair advantage over the other.

B. *The Burkles' postmarital agreement did not give Mr. Burkle an unfair advantage.*

Whether an interspousal transaction gives one spouse an unfair advantage is a question for the trier of fact.[11] The trial court declined to apply a presumption of undue influence to the Burkles' postmarital agreement, finding nothing unfair about the transaction. The court instead found the agreement provided mutual advantages—the converse of an agreement which "advantages one spouse to the disadvantage of the other" (*Delaney, supra,* 111 Cal.App.4th at p. 996): "In light of each party's goals and desires, the Court finds that the Agreement was fair and equitable, effectively compromising a multitude of issues between the parties. At the time that the Agreement was entered into, substantial good faith disputes existed as to the date of separation, the valuation and characterization of marital and separate property, the use of a tax-effected valuation basis for calculating values, and other factors. The Agreement provided mutual advantages to both [Ms. Burkle] and [Mr. Burkle]. The Agreement provided [Ms. Burkle] with an assured and very substantial sum, bearing interest at 5% per annum until paid, regardless of any decrease in the overall size of the marital estate. It also provided [Ms. Burkle] with annual payments of $1 million which were to be her sole and separate property. At the same time, the Agreement provided [Mr. Burkle] with the ability to pursue his high-risk business ventures." Thus, the trial court found that the agreement provided mutual advantages to both Ms. Burkle and Mr. Burkle; that Ms. Burkle "in fact obtained the advantage she was bargaining for of financial security"; and that no presumption of undue influence arose by virtue of the parties' entry into the agreement. We can discern no flaw in the trial court's findings on this point, which are further supported by the express terms of the agreement itself, as well as by

[11] The point is demonstrated by cases involving the presumption of undue influence exercised by a beneficiary under a will. The presumption of undue influence arises if three elements are shown: a confidential relationship, active participation in the preparation of the will, and undue profit accruing to the beneficiary. If those elements are shown, a presumption of undue influence arises and the will proponent has the burden of proving no undue influence. However, "[i]t is for the trier of fact to determine whether the presumption will apply and whether the burden of rebutting it has been satisfied." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605 [270 Cal.Rptr. 560].)

the fact that Ms. Burkle was advised by a number of sophisticated lawyers when she executed the agreement.[12]

Ms. Burkle cites *In re Marriage of Lange* (2002) 102 Cal.App.4th 360 [125 Cal.Rptr.2d 379] (*Lange*) and *Haines, supra,* 33 Cal.App.4th 277, asserting that the disadvantaged spouses in those cases also obtained "<u>some</u> advantage," but the courts nonetheless concluded that a presumption of undue influence applied. An examination of the cases belies Ms. Burkle's assertion. In neither case did the trial court find that the transaction involved advantages to both spouses. Indeed, both cases reflect express conclusions, in *Lange* by the trial court and in *Haines* by the Court of Appeal, that one spouse obtained an advantage over the other, giving rise to the presumption of undue influence. While the courts in those cases did not use the term "unfair" to describe the advantage obtained by one spouse over the other, the essence of both *Haines* and *Lange* was that the advantage was unfair.[13] Neither case involved circumstances even faintly comparable to those giving rise to the Burkles' postmarital agreement.

In this case, the trial court expressly found the parties obtained mutually agreeable advantages. This is therefore not a case of unfair advantage, where "one spouse has taken advantage of another in an interspousal

---

[12] Ms. Burkle points out that the employment of able counsel does not relieve a spouse of his or her fiduciary obligations. (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 339–340 [15 Cal.Rptr. 71, 364 P.2d 247] (*Vai*).) We agree. The point, however, is irrelevant to the determination of whether one spouse has obtained an unfair advantage in an interspousal transaction and thus raised a presumption of undue influence.

[13] *Haines* involved a quitclaim deed by which the wife deeded her interest in the couple's residence to the husband, during the period in which their marriage was deteriorating, in return for the husband's cosignature on a car loan for an automobile needed by the wife. As the court observed, "where Judy transferred her interest in real property to Clarence for his cosignature on an automobile loan—clearly inadequate consideration for execution of the quitclaim deed—Clarence properly should have borne the burden of rebutting the presumption of undue influence . . . ." (*Haines, supra,* 33 Cal.App.4th at p. 296.)

In *Lange,* the trial court found a husband's $250,000 promissory note and deed of trust in favor of his wife, which the husband executed at the wife's behest for her separate property contributions to the acquisition and improvement of their jointly owned residence, provided the wife with a financial advantage and were presumed to have been obtained through undue influence. (*Lange, supra,* 102 Cal.App.4th at pp. 361, 363.) The wife argued she obtained no advantage as a matter of law, because the note and deed of trust she prepared for her husband's signature were a substitute for her statutory rights to reimbursement. The Court of Appeal found the wife received an advantage as a matter of law, because she became a secured creditor additionally entitled to 10 percent interest on the husband's obligation (which amounted to $870,000 by the time of trial), rights to which she would not be entitled had she pursued her statutory right to reimbursement. (*Id.* at p. 364.) The Court of Appeal also found the trial court correctly concluded the wife did not dispel the presumption of undue influence. (*Id.* at p. 365.) *Lange* was not a case where the husband received any advantage from the transaction.

transaction . . . ."[14] (*Haines, supra,* 33 Cal.App.4th at p. 301.) A presumption of undue influence cannot logically be applied in a case where benefits are obtained by both spouses, where the spouses are represented by sophisticated counsel, and where the spouses expressly acknowledge that neither has obtained an unfair advantage as a result of the agreement. The trial court did not err in concluding that no presumption of undue influence arose, and that Ms. Burkle therefore had the burden of proving, by a preponderance of the evidence, that the postmarital agreement was invalid.

II. *Even if a presumption of undue influence applied, the trial court's conclusion must be affirmed because it is supported by substantial evidence.*

Even if we assume Mr. Burkle gained an advantage sufficient to invoke the presumption of undue influence, and the trial court therefore misallocated the burden of proof, we would nevertheless be required to affirm the trial court's order. Contrary to Ms. Burkle's claim, misallocation of the burden of proof is not "reversible error *per se,*" does not vitiate the substantial evidence rule and, in this case, would not require reversal of the judgment.[15]

---

[14] Ms. Burkle argues the agreement gave Mr. Burkle an advantage as a matter of law, because the $30 million plus 5 percent interest to be paid to her upon division of the community estate was an unsecured promise, and was to be paid in installments. Her theory is that Mr. Burkle's unsecured promise was "worth much less than Jan's share of the community property which was to be actually turned over to Ron when the [postmarital agreement] was triggered." The argument is flawed for two reasons. First, it is impossible to know the value of the community property that was to be awarded to Mr. Burkle at an unknown future date. As the trial court observed, Ms. Burkle was willing to accept the agreed amount, "rather than accept the risk of falling asset values, given [Mr. Burkle's] investment strategy." In other words, Ms. Burkle would obtain the agreed $30 million plus interest "regardless of any decrease in the overall size of the marital estate." Ms. Burkle's argument works only in retrospect. Second, when spouses agree on a division of property, "no law requires them to divide the property equally, and the court does not scrutinize the [marital settlement agreement] to ensure that it sets out an equal division." (*Mejia v. Reed* (2003) 31 Cal.4th 657, 666 [3 Cal.Rptr.3d 390, 74 P.3d 166].)

[15] Ms. Burkle also contends the substantial evidence rule does not apply because the trial court "failed to respond to virtually all of Jan's Objections and Requests for Findings, thus invoking the provisions of C.C.P. § 634 . . . ." Ms. Burkle misconceives the purpose and effect of Code of Civil Procedure section 634. Section 634 applies when a statement of decision fails to resolve or is ambiguous as to a controverted issue, and the omission or ambiguity is brought to the court's attention. In such a case, "it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.) However, the trial court is not required to respond point by point to issues posed in a request for a statement of decision. "The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380 [25 Cal.Rptr.2d 242]; see also *Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118 [54 Cal.Rptr.2d 377] [trial court "is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case"];

A. *The trial court's decision must be affirmed if substantial evidence supports the conclusion that the presumption of undue influence was rebutted.*

The question "whether the spouse gaining an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence." (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 632 [35 Cal.Rptr.3d 1] (*Mathews*); see *Weil v. Weil, supra*, 37 Cal.2d at p. 788.) *Mathews* is directly on point, as the trial court in that case improperly refused to apply the presumption of undue influence. The judgment was nonetheless affirmed because substantial evidence rebutted the presumption.

In *Mathews*, the wife had quitclaimed her interest in the couple's residence to the husband, in order to obtain a more favorable interest rate on a mortgage. Throughout the marriage, both parties believed the residence was community property and, after separation, discovered title was in the husband's name alone. The trial court declined to apply a presumption of undue influence, and determined the wife entered into the transaction freely, voluntarily and with a full understanding of the quitclaim deed. The Court of Appeal concluded that the trial court "improperly refused to apply the [Family Code] section 721 presumption of undue influence" and that the husband had the burden of overcoming the presumption of undue influence. (*Mathews, supra*, 133 Cal.App.4th at p. 630.) However, the trial court had "conclu[ded] that the quitclaim deed was the voluntary and deliberate act of [the wife], taken with full knowledge of its legal effect, and [the husband] did not unduly influence [the wife] to acquire title to the residence in his name alone." (*Id.* at p. 632.) Because the question whether the presumption of undue influence was overcome is a question for the trier of fact, and because substantial evidence supported the trial court's conclusion, the Court of Appeal affirmed the

---

*In re Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 686–687 [226 Cal.Rptr. 485] [trial court's statement of decision is required only to state ultimate rather than evidentiary facts].) Ms. Burkle fails to identify specifically any material controverted issue or ultimate fact that the statement of decision left unresolved or ambiguous. The five or six objections she mentions in her brief as having been unanswered in the statement of decision include, for example, an objection to the trial court's finding that the credible evidence overwhelmingly established that any presumption of undue influence was rebutted. Her objection, as Mr. Burkle points out, was merely an expression of disagreement with the trial court's conclusion. The trial court's statement of decision in this case fairly discloses its determinations on all the ultimate facts and material issues in the case, and Ms. Burkle's challenge on this ground has no merit.

judgment: "Substantial evidence supports the conclusion that Husband rebutted the presumption of undue influence over Wife's signing the quitclaim deed by a preponderance of the evidence."[16] (*Mathews, supra,* 133 Cal.App.4th at p. 632.)

Ms. Burkle urges us to disregard *Mathews*, and cites several cases which find that an error in assigning the burden of proof was reversible error. The cases do not assist her, because an error in allocating the burden of proof must be prejudicial in order to constitute reversible error. In the cases cited, the result may have been different had the proper party been assigned the burden of proof.[17] The case is otherwise here, where the trial court found the credible evidence "established overwhelmingly" that the agreement was not procured by undue influence. Accordingly, if substantial evidence supports the trial court's conclusion, we must affirm the order.

 B. *In this case, the trial court's conclusion that any presumption of undue influence was rebutted is supported by substantial evidence.*

When a presumption of undue influence applies to a transaction, the spouse who was advantaged by the transaction must establish that the

---

[16] Ms. Burkle claims not only that Mr. Burkle had the burden of proof, but also that he was required to prove lack of undue influence by clear and convincing evidence. For this point, she cites *Gold v. Greenwald* (1966) 247 Cal.App.2d 296, 306 [55 Cal.Rptr. 660], which held an attorney must offer " 'clear and satisfactory evidence' " that a transaction with a client was fair and equitable, no advantage was taken by him, and the client was fully informed. To the extent *Gold* may be read to require clear and convincing evidence, we prefer to follow the more recent decision in *Mathews,* which involves a marital dissolution and is directly on point. In any event, the trial court in this case found the credible evidence was overwhelming on the point.

[17] E.g., *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693] (trial court erred in placing the burden of proof in administrative proceeding on the wrong party and in failing to presume the correctness of the administrative decision; court rejected the contention that the error did not affect the trial court's decision, because the record demonstrated that the trial court repeatedly relied on the failure to meet the burden of proof, and indeed stressed that the evidence was evenly balanced and the party with the burden of proof would lose); *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 439 [212 Cal.Rptr. 466, 696 P.2d 1308] (insurer had the burden to prove insured's suicide was intentional; an erroneous instruction allowed the jury to conclude that beneficiary of policy was required to prove that the insured acted unintentionally and insurer had no burden to prove any of the contested issues); *Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 393 [70 Cal.Rptr.2d 427] (giving the wrong party the burden of proof on a dispositive issue when the evidence is in dispute is a major instructional error, but a judgment may not be reversed for misdirection of the jury absent a miscarriage of justice); *In re Marriage of Schwartz* (1980) 104 Cal.App.3d 92, 95–96 [163 Cal.Rptr. 408] (wife sought modification of a court-approved custody agreement that allowed one child to reside with the wife and the other with the husband; trial court prejudicially abused its discretion by making its ruling on the basis of its "unshakable prejudice" and preexisting bias against splitting custody; in addition, "[s]omehow the court had persuaded itself that [the husband], rather than [the wife] was the moving party" and had the burden of proof, an error which was itself sufficient to mandate reversal).

disadvantaged spouse's action "was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of the effect of" the transaction. (*Delaney, supra,* 111 Cal.App.4th at p. 1000; see also *Mathews, supra,* 133 Cal.App.4th at p. 631; *Haines, supra,* 33 Cal.App.4th at p. 296.) In this case, the trial court expressly found that, even if a presumption of undue influence had arisen, "the credible evidence at trial established overwhelmingly that any such presumption would have been fully and completely rebutted." Substantial evidence supports that conclusion. The trial court heard testimony from both of the Burkles and made express findings on each of the three factors, delineated in *Delaney* and other cases, that rebut the presumption of undue influence: the transaction was entered freely and voluntarily, with full knowledge of the facts, and with a complete understanding of its legal effect. Thus:

—The court found that Ms. Burkle "did, in fact, enter into the Agreement freely, willingly and voluntarily, and free of any fraud, duress, medical condition or undue influence." Numerous subsidiary findings supported this conclusion. (See pp. 724–725, *ante.*)

—As to Ms. Burkle's "full knowledge of all the facts"—a point addressed further in the succeeding section—the trial court found that Mr. Burkle fulfilled "his duty to make a true and full disclosure of community assets," and he "did disclose in good faith his sincerely held and reasonable estimates of the value and characterization of the community property and his separate property." It found that Mr. Burkle made all relevant financial information available to Ms. Burkle's attorneys and accountants for their inspection and review, and Ms. Burkle was free at all times to have her representatives review and investigate that information. It found that Ms. Burkle knew about the first merger, between Smith's and Fred Meyer, before she signed the agreement. It found that the possibility of a second merger between Food-4-Less/Ralphs and Fred Meyer/Hughes was discussed at a meeting among the parties and their counsel. It further found that in later correspondence Ms. Burkle's attorney referred to the possibility of the merger and proposed that Ms. Burkle should share in future appreciation from such a merger. In the agreement itself, Ms. Burkle acknowledged she was aware that the assets on Schedules A and C "may, and probably will, increase dramatically in value in the future . . . ."

—As to Ms. Burkle's understanding of the effect of the agreement, the recitals in the agreement, her representation by a number of attorneys, including family law specialists, and her own and her attorney's certifications leave no doubt that she understood the legal effect of the agreement.

In sum, substantial evidence supports the trial court's conclusion that any presumption of undue influence was rebutted. (*Mathews, supra,* 133 Cal.App.4th at p. 632.) Indeed, Ms. Burkle does not address the trial court's factual findings, but instead takes the position that the substantial evidence rule does not apply, and that she is at liberty to state the case as she chooses and without reference to the findings. As we have seen, that position is mistaken. As in *Mathews,* this record furnishes no basis for overturning the trial court's decision that Ms. Burkle "did, in fact, enter into the Agreement . . . free of any . . . undue influence."[18]

III. *Ms. Burkle's contention that the agreement must be set aside because Mr. Burkle procured it through "actual fraudulent misrepresentation and concealment" is entirely without merit.*

Of course, spouses entering into agreements relating to marital assets may not misrepresent or conceal facts materially affecting the value of the marital assets. (*Boeseke v. Boeseke* (1974) 10 Cal.3d 844, 850 [112 Cal.Rptr. 401, 519 P.2d 161] (*Boeseke*) [spouse represented by independent counsel who has accepted a proposed settlement and has forgone a suggested investigation "may not later avoid the agreement unless there has been a misrepresentation or concealment of material facts"].) Ms. Burkle contends she may avoid the Burkles' postmarital agreement because Mr. Burkle procured it through "actual fraudulent misrepresentation and concealment" as a matter of law. The contention again is without merit.

Ms. Burkle's argument is premised on the fact that two mergers were in various stages of negotiation between June 1997, when Ms. Burkle filed her petition for dissolution, and November 21, 1997, when Mr. Burkle signed the agreement, and "[n]ot one word of either of these mergers is referenced in the [postmarital agreement]." Further, the footnotes to the schedules are alleged to "affirmatively dramatically misrepresent these assets [marital assets affected by the mergers]." As best we can discern the argument, these alleged concealments and misrepresentations are claimed to constitute both constructive fraud and actual fraud, as a matter of law, because Mr. Burkle had a

---

[18] See also *In re Marriage of Friedman* (2002) 100 Cal.App.4th 65, 72, 67 [122 Cal.Rptr.2d 412] (appellate court was bound by the trial court's factual finding that the husband carried the burden of showing that the wife " 'was not induced to execute the postnuptial agreement through mistake, undue influence, fraud, misrepresentation, false promise, concealment, nondisclosure or any other breach of the [spouses'] confidential relationship' "; "[j]udicial erasure of a competent adult's signature on an agreement does not serve the purpose of the law of contracts, i.e., to protect the reasonable expectations of the parties").

fiduciary duty "to furnish in writing to Jan, without demand, sufficient information concerning the merger transaction so as to afford Jan the opportunity to properly exercise her rights and duties as a partner in the assets."[19] Neither the law nor the facts support this claim.

The applicable law is clear. The pertinent rule is that a spouse who forgoes investigation and accepts a proposed settlement "may not later avoid the agreement unless there has been a misrepresentation or concealment of material facts." (*Boeseke, supra,* 10 Cal.3d at p. 850.) In this case, the Burkles agreed to value the marital estate as of June 6, 1997; Ms. Burkle's representatives were offered full access at Mr. Burkle's office to all financial information throughout the negotiations; Ms. Burkle knew about the first merger, which was consummated before she signed the agreement, and she knew Mr. Burkle was working on the second merger; Mr. Burkle testified that documentation on the second merger was available for review by Ms. Burkle's representatives in Mr. Burkle's office; and Ms. Burkle's representatives did not review the information. Under these circumstances, only an actual concealment or misrepresentation would allow Ms. Burkle to avoid her agreement.

*Boeseke* is instructive. In that case, the spouses executed a property settlement agreement which was subsequently adopted in a divorce decree. In negotiating the property settlement, the husband, who had managed the community property, gave the wife and her attorney his verbal valuation of the community property. However, he insisted on a "no representation" provision stating that neither party made any representations concerning property values and that each relied on his or her own investigation. Against her attorney's advice, the wife elected not to investigate and signed the agreement proposed by the husband. After the husband died leaving a substantial estate, the wife sued to rescind the agreement. The trial court concluded that the husband failed to disclose the facts relating to the value, nature and extent of the community assets, and that this nondisclosure constituted concealment of a material fact, breach of fiduciary duty, and fraud. (*Boeseke, supra,* 10 Cal.3d at p. 848.) The Supreme Court, however,

---

[19] Ms. Burkle claims, for example, that Mr. Burkle was required to inform her, in writing, that upon consummation of the Food-4-Less/Ralphs merger with Fred Meyer/Hughes (announced just after Ms. Burkle signed the agreement and consummated some four months later), the Ralphs stock "would no longer be privately held but traded into public shares of Fred Meyer stock," and the merger would result in a "$20 Million fee payable to Yucaipa, a community company; and the issuance of to Ron of $14 Million in stock warrants." The trial court found that this information "should readily have been discovered and addressed prior to the parties' entry into the Agreement in 1997 if [Ms. Burkle] and her counsel had reviewed the information which [Mr. Burkle] made available to them . . . ."

held otherwise. The court observed it was true the husband did not disclose all facts in his possession relating to the value, nature and extent of the community property, but the wife and her counsel were fully advised of the property descriptions; were aware some of it was of substantial value; but did not request further facts relating to the value, the nature or the extent of the marital assets. Instead, the wife chose to accept her husband's offer of settlement "even after being advised by counsel that she should investigate." (*Id.* at p. 849.) The trial court's finding of fraud predicated on lack of disclosure therefore failed. (*Ibid.*) The Supreme Court observed: "[W]hen a spouse, represented by independent counsel, determines to forego a suggested investigation and to accept a proposed settlement, that spouse may not later avoid the agreement unless there has been a misrepresentation or concealment of material facts. Under such circumstances, the spouse proposing the agreement is under no duty to compel the other to investigate, and the accepting spouse's decision, though ill advised, is binding."[20] (*Boeseke, supra,* 10 Cal.3d at p. 850, fn. omitted.)

Ms. Burkle insists that *Vai* is controlling, and supports the proposition that Mr. Burkle violated his fiduciary duty to Ms. Burkle by failing affirmatively to advise her, in writing, that he was "in the final stages of negotiation and completion of a second major merger."[21] *Vai* does not assist Ms. Burkle, and indeed was expressly distinguished by the Supreme Court in *Boeseke.* In *Vai,* the wife sued the executor of her deceased husband's estate to rescind a property settlement agreement on the ground of actual and constructive fraud. (*Vai, supra,* 56 Cal.2d at pp. 333, 335.) The trial court found the husband was not a fiduciary, the parties dealt at arm's length, and there was no issue of constructive fraud and no proof of actual fraud. (*Id.* at p. 335.) The Supreme Court reversed the judgment, holding that, under the facts found by the trial court, the husband was a fiduciary, and the "failure of the husband . . . to disclose fully and fairly material facts relating

---

[20] Cf. *Collins v. Collins* (1957) 48 Cal.2d 325 [309 P.2d 420] (wife who was aware that her husband had not disclosed any information about their community property, and who waived the disclosure in writing when she executed a property settlement agreement, knowingly chose to deal at arm's length and rely on her own investigation of community assets, thus terminating the fiduciary relationship and attendant duty to disclose). While we do not suggest the fiduciary relationship was terminated in this case, certainly Ms. Burkle knew about the mergers being negotiated by Mr. Burkle; knew the postmarital agreement contained no references to any mergers; acknowledged she had had the opportunity to conduct as much independent discovery, appraisal and valuation as she wished; and expressly stated that "she ha[d] not relied on the word of Ron in determining the value of the assets set forth" in the agreement.

[21] In the Burkles' agreement, the parties purported to release their fiduciary responsibilities to each other. We need not consider the question whether such a release is permissible under California law, as the trial court did not rely on or even allude to any waiver or release of fiduciary duties. It expressly found that Mr. Burkle fulfilled his fiduciary duties to Ms. Burkle, "including those in connection with the negotiation of and entry into" the agreement and "including his duty to make a true and full disclosure of community assets."

to the value of community assets from which [he] gained an advantage constitutes a concealment of material facts and a breach of this fiduciary duty." (*Id.* at p. 342.) The facts found by the trial court included the husband's representations that the adversary proceedings the wife had begun would be detrimental to his health; that the wife need not pursue her legal remedies of discovery; and that he would supply full and complete information concerning the property. (*Id.* at p. 334.) The husband then represented to the wife that the book value of vineyard land was $200 per acre, but did not inform her that, several weeks before the property settlement agreement, he had executed a sale deposit receipt for the land at a price of $814 per acre.[22] (*Id.* at p. 340.) These "facts as found by the trial court show[ed] . . . constructive fraud as a matter of law." (*Id.* at p. 342.)

The "facts as found by the trial court" in this case are light years from those in *Vai.* As the Supreme Court explained in *Boeseke,* distinguishing *Vai*: "*Vai* . . . is distinguishable because the wife did investigate, and while the husband made representations of fact and value relating to their ranch, he failed to disclose he had accepted a deposit on the property for a price greatly in excess of the value suggested by his representations. . . . [T]he husband's failure to disclose that information constituted a concealment of a material fact concerning the property. In contrast, [the wife in *Boeseke*] was made aware that the facts relating to value and income were neither fully disclosed nor settled."[23] (*Boeseke, supra,* 10 Cal.3d at p. 850, fn. 5.) Neither *Vai* nor any other case suggests that, as a matter of law, Mr. Burkle was required to provide Ms. Burkle with written details about a contemplated merger—the prospect of which was known to and had been discussed previously among the parties and counsel—in order to fulfill his fiduciary duty of full and fair disclosure.

As for the facts, no evidence indicates actual concealment or misrepresentation of information relating to the mergers. Again, Ms. Burkle ignores the trial court's findings. As we have seen, the court concluded that Mr. Burkle

---

[22] The court also observed that it was "readily apparent" that many representations the husband made to the wife "were either not true or at least only partially true" (*Vai, supra,* 54 Cal.2d at p. 340); that many of the wife's contentions relating to the existence of actual fraud appeared meritorious; and that the deception was practiced on the husband's own attorneys as well as on the wife. (*Id.* at p. 342.)

[23] Ms. Burkle also cites *In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334 [113 Cal.Rptr.2d 849] (*Brewer*). It, too, is of no assistance to Ms. Burkle. In *Brewer,* a marital settlement agreement was set aside on the ground of mistake of fact, because the wife's final declaration of disclosure, required by Family Code section 2105 to include all material facts regarding the valuation of community assets, listed as "unknown" the value of one of her pension plans. The case does not involve misrepresentation or concealment; it merely held the wife did not meet her disclosure obligations when she stated the value of the pension, which was one of the largest community assets and whose monetary value was easily ascertainable, was unknown. (93 Cal.App.4th at pp. 1346–1347.)

did not conceal assets or significant financial information from Ms. Burkle. This ultimate conclusion was based on substantial evidence reflected in numerous subsidiary factual findings, many of which have already been enumerated. The court found that Mr. Burkle fulfilled his fiduciary duties to Ms. Burkle, "including those in connection with the negotiation of and entry into the Agreement." It found that the selection of a fixed date for valuation of the assets was reasonable and necessary, given the size of the marital estate, and that the agreed valuation date—June 6, 1997—was reasonable and selected in good faith. It found that the overall value of the assets on the community property schedule did not materially change between June and November 1997. It found that Ms. Burkle had "every opportunity to investigate any changes in value of any assets from the chosen June 6, 1997 date to the date of execution of the Agreement." It found she and her attorneys knew about the first merger—which involved shares in Smith's which she agreed to characterize as Mr. Burkle's separate property—well before the agreement was executed.[24] It found the parties discussed the possibility of a second merger, and Ms. Burkle's counsel proposed she should share in any resulting appreciation from such a merger, a proposition that was rejected. It found that Mr. Burkle made all relevant financial information available for review by Ms. Burkle's attorneys and accountants.

Under these circumstances, there was no constructive or actual fraud. If Ms. Burkle wanted further information on the particulars of a contemplated transaction, she should have pursued the opportunity to review and investigate information open to her throughout the negotiations. (See *Boeseke, supra,* 10 Cal.3d at p. 850.) Certainly, it cannot be said that Mr. Burkle either concealed or misrepresented any information about either merger. The trial court's conclusion that Mr. Burkle did not conceal significant financial information from Ms. Burkle was fully justified.[25]

---

[24] Ms. Burkle's claims of actual misrepresentations relate to the first merger, specifically, the description and value of the Smith's shares which Mr. Burkle claimed as separate property. However, as *Boeseke* stated, "when the husband takes the position certain property is separate, the wife must then investigate the facts. If she and her counsel choose to accept his assertion, she may not collaterally attack the subsequent judgment approving the settlement." (*Boeseke, supra,* 10 Cal.3d at p. 850.)

[25] Ms. Burkle makes several other arguments related to her claims of concealment and other bases for asserting the invalidity of the postmarital agreement, none of which have merit:

1. Ms. Burkle complains in effect that she was unable to show whether the information Mr. Burkle provided in the schedules to the agreement was "truthful or fraudulent" because of the discovery "firewall" erected when the trial court refused, at this stage of the proceedings, to compel discovery concerning the assets and liabilities identified on the schedules. We can discern no error in the court's discovery ruling, which allowed full discovery on the circumstances surrounding entry into the agreement—which circumstances included Ms. Burkle's full access to the information she now complains is behind the firewall.

2. Ms. Burkle contends that, even in the absence of any actual fraud or actual undue influence, statutory limitations on the specific enforcement of contracts in Civil Code section

IV. *Ms. Burkle's claim the agreement must be set aside for failure to serve the sworn disclosure declarations required by Family Code section 2100 et seq. is without merit.*

■ The Family Code requires the parties to a dissolution proceeding to serve on each other a preliminary, sworn declaration, on forms prescribed by the Judicial Council, identifying all assets and liabilities.[26] (Fam. Code, § 2104, subds. (a) & (c).) Similarly, before the parties to a dissolution proceeding enter into an agreement for the resolution of property issues, or before any trial, each must serve on the other "a final declaration of disclosure and a current income and expense declaration, executed under penalty of perjury on a form prescribed by the Judicial Council . . . ."[27] (Fam. Code, § 2105, subd. (a).) These mandatory statutory requirements cannot be waived, except in strict compliance with provisions of the statute.[28] (*In re*

---

3391 prevent Mr. Burkle from enforcing the contract against Ms. Burkle. Section 3391 prevents enforcement of specific performance against a party to a contract if she has not received adequate consideration, or if the contract is not, as to her, just and reasonable. Section 3391 does not apply, because (a) this is not an action for specific enforcement of a contract, and (b) even if it were, the trial court found the agreement was fair and equitable in light of each party's objectives, and implicitly, if not explicitly, found adequate consideration. Ms. Burkle has not challenged the sufficiency of the evidence supporting these findings, but relies on her claim that all the trial court's fact findings are "vitiate[d]" by the asserted misallocation of the burden of proof. As we have seen, that claim is mistaken.

3. In connection with her contention that Mr. Burkle must prove the postmarital agreement was "fair, just and equitable," Ms. Burkle asserts that "this means that the division of the community must be equal." Her assertion is mistaken. Spouses may agree on an unequal distribution of assets. "As long as such agreement is based upon a complete and accurate understanding of the existence and value of community and separate assets that are material to the agreement, the parties are free to decide on an unequal distribution." (*Brewer, supra,* 93 Cal.App.4th at p. 1349.)

[26] Family Code section 2104 requires each party to a dissolution proceeding to serve on the other, "[a]fter or concurrently with service of the petition for dissolution . . . a preliminary declaration of disclosure, executed under penalty of perjury on a form prescribed by the Judicial Council." Along with the preliminary declaration of disclosure, each party must provide the other party with a completed income and expense declaration. (Fam. Code, § 2104, subds. (a) & (e).)

[27] Family Code section 2105, subdivision (a), states: "Except by court order for good cause, before or at the time the parties enter into an agreement for the resolution of property or support issues other than pendente lite support, or, if the case goes to trial, no later than 45 days before the first assigned trial date, each party, or the attorney for the party in this matter, shall serve on the other party a final declaration of disclosure and a current income and expense declaration, executed under penalty of perjury on a form prescribed by the Judicial Council, unless the parties mutually waive the final declaration of disclosure. The commission of perjury on the final declaration of disclosure by a party may be grounds for setting aside the judgment . . . ." (Fam. Code, § 2105, subd. (a).)

[28] The parties may stipulate to a mutual waiver of the requirements concerning the final declaration of disclosure, but only under specified conditions, including exchange of the preliminary disclosure declarations and exchange of current income and expense declarations. (Fam. Code, § 2105, subd. (d).)

*Marriage of Fell* (1997) 55 Cal.App.4th 1058, 1060, 1064–1066 [64 Cal.Rptr.2d 522] [affirming a judgment setting aside an original judgment of dissolution and marital settlement agreement, based upon an impermissible waiver of the mandatory exchange of disclosure declarations at the time of dissolution].)

Ms. Burkle contends that, because the parties did not exchange the sworn preliminary and final disclosure declarations described in sections 2104 and 2105, their postmarital agreement is invalid and unenforceable as a matter of law. The trial court rejected this contention, concluding that the Family Code provisions in question were not applicable to the Burkles' agreement: "Based on the location of those sections in Chapter 9 of Division 6 of the Family Code, and considering the references therein to trials, trial dates and the like, Family Code § 2100 *et seq.* only apply to agreements entered into incident to a dissolution of marriage or legal separation action that is proceeding to judgment. Unlike an agreement . . . which contemplates prompt entry of a judgment of marital dissolution . . . , the Agreement clearly was not entered into by the parties in connection with the contemplated ending of their marriage. Rather, the Agreement was reached after the dissolution proceeding had been placed in abeyance for the purpose of attempting to continue the marriage and allowing the parties the opportunity to reconcile, even though a reconciliation was not a condition of the Agreement. The purposes and goals of the Agreement were consistent with the clear public policy of the State of California favoring the continuation of marriages, and not ending them."

We agree with the trial court that Family Code sections 2104 and 2105 were not intended to and do not apply to a postmarital agreement that was not executed in contemplation of the imminent dissolution of the marriage, and indeed, that was expressly intended "to promote increased understanding, harmony and trust" and was made with the "intent to make a good faith effort to reconcile [the parties'] differences . . . ." The legislative findings and declarations in Family Code section 2100 make clear that the statute applies to agreements that contemplate a judgment dissolving the marriage, not agreements that contemplate a reconciliation. The structure and language of other provisions of the statute likewise make this intention clear. A few examples should suffice.[29]

First, Family Code section 2100 states the Legislature's findings and declarations. The first policy declared by the Legislature is to marshal and preserve community assets "that exist at the date of separation so as to avoid dissipation of the community estate before distribution . . . ." (Fam. Code,

---

[29] Some amendments have been made to Family Code section 2100 et seq. since the Burkles' 1997 postmarital agreement. Because the changes are insignificant for purposes of our discussion, all quotations in this section reflect the current statutory language.

§ 2100, subd. (a)(1).) The second policy is to ensure fair and sufficient child and spousal support awards, and the third is to achieve a division of community assets as provided under California law "on the dissolution or nullity of marriage or legal separation of the parties . . . ." (Fam. Code, § 2100, subd. (a)(2) & (3).) The Legislature further states that sound public policy "favors the reduction of the adversarial nature of marital dissolution and the attendant costs by fostering full disclosure and cooperative discovery." (Fam. Code, § 2100, subd. (b).) From these stated policies, it is apparent that the asset disclosures required by the statute are attendant upon the separation of the parties and the imminent dissolution of the marriage, whether after a trial or by agreement of the parties.

Second, other provisions likewise make clear that the statute contemplates a judgment of dissolution in connection with the agreement for resolution of property issues to which the statute refers. Family Code section 2104, which requires service of preliminary disclosure declarations, indicates in the immediately succeeding sentence that the commission of perjury on the preliminary declaration "may be grounds for setting aside the judgment . . . ." (Fam. Code, § 2104, subd. (a).) The same language is used in section 2105 with respect to perjury on the final declaration of disclosure. (Fam. Code, § 2105, subd. (a).) Family Code section 2106 specifies that "no judgment shall be entered with respect to the parties' property rights without" the execution and service of the final declaration of disclosure and current income and expense declaration.[30] In addition, section 2105 requires the service of a current income and expense declaration with the disclosure declaration, a requirement which makes no sense in the context of a postmarital agreement in which the parties do not intend an imminent dissolution of the marriage. (Fam. Code, § 2105, subd. (a).)

In short, the Legislature's own words show it intended the asset disclosure requirements of Family Code section 2100 et seq. to apply to property agreements executed in connection with or in contemplation of a judgment of dissolution of the marriage. Nothing in the statutory language suggests any intent to extend the asset disclosure requirements to postmarital agreements that do not contemplate imminent dissolution, and instead contemplate an effort to reconcile.

■ Ms. Burkle insists that Family Code section 2105, subdivision (a), is applicable "[b]y its terms . . . whenever 'the parties enter into an agreement

---

[30] In 2001, the Legislature also added a provision to Family Code section 2107, which now specifies that if a court enters a judgment when the parties have failed to comply with the statutory disclosure requirements, "the court shall set aside the judgment." (Fam. Code, § 2107, subd. (d).)

for the resolution of property or support issues.' " If so, we are inclined to think the Legislature would have stated exactly that, and of course it did not. Ms. Burkle ignores the remainder of the sentence, not to mention the rest of the subdivision and the other provisions of the statute. In any event, we do not determine the meaning of a statute—assuming it is ambiguous—"from a single word or sentence. Instead, we construe the words and sentences in context and in the light of the statutory scheme." (*Department of Industrial Relations v. Lee* (1999) 73 Cal.App.4th 763, 767 [86 Cal.Rptr.2d 710].) The statutory scheme leaves no doubt as to the statutory meaning.[31]

Finally, Ms. Burkle protests the parties did not agree to reconcile; the agreement constitutes a "pre-packaged divorce"; and a dissolution proceeding was pending when the agreement was executed. None of these arguments is sufficient to induce us to apply a statute governing dissolution proceedings to circumstances in which the parties are not in fact using the judicial system to seek dissolution of their marriage. It may be a preferable rule, where a petition for dissolution has been filed, to require spouses who wish simultaneously to attempt reconciliation and resolve their financial disputes to file sworn disclosure declarations, unless the dissolution proceeding is dismissed. That, however, is a matter for the Legislature, and not for the courts, to undertake.

■ The remaining question involves the standard under which a trial court may find that a dissolution proceeding was "placed in abeyance" and that an agreement resolving property issues was not executed in contemplation of imminent dissolution of the marriage. Certainly parties to a dissolution proceeding cannot be permitted to avoid Family Code section 2100's mandatory sworn disclosure declarations merely by asserting an intention to attempt reconciliation, executing an agreement without statutory disclosures, and then resuming the dissolution proceedings. We are confident, however, that trial courts are well equipped to determine whether a dissolution proceeding was in abeyance or whether one or both spouses were improperly attempting to avoid mandatory and nonwaivable disclosure requirements. The factors the trial court must assess include, but are not limited to, the bona fides of the spouses' intention to attempt reconciliation; their intention to hold the dissolution proceeding in abeyance; the length of time during which the

---

[31] See also the language in *Bonds, supra,* 24 Cal.4th at page 30, referring to Family Code section 2100 et seq. and to the statute's "policy of equal division of assets at the time of dissolution . . . ." The Burkles' postmarital agreement was not entered into "at the time of dissolution," and indeed permitted an election to divide the community estate at any time.

spouses reside together, after initiating the dissolution proceeding, in connection with their attempts to reconcile; the duration of any actual reconciliation; and the length of time during which no activity has occurred in the dissolution proceeding.[32]

In this case, the trial court properly concluded the dissolution proceeding was in abeyance, and the agreement "clearly was not entered into by the parties in connection with the contemplated ending of their marriage." The parties expressly stated their intent to make a good faith effort to reconcile their differences. They were not separated when they executed the agreement, explicitly acknowledging in the agreement that they were "currently residing together at the Green Acre property." They continued to reside together for at least four years after executing the postmarital agreement. After the dissolution petition was filed on June 10, 1997, followed by a confidentiality stipulation on August 26, 1997, no activity occurred in the proceeding for almost six years.[33] Under these circumstances, no conclusion is possible except that the dissolution proceeding was "placed in abeyance for the purpose of attempting to continue the marriage . . . ." Accordingly, because the postmarital agreement was not executed in connection with the imminent dissolution of the marriage, Family Code sections 2104 and 2105 do not apply.[34]

## V. *Ms. Burkle's claim that she properly rescinded the agreement for nonperformance and failure of consideration is without merit.*

Ms. Burkle served her petition for dissolution on Mr. Burkle on June 26, 2003. Under the postmarital agreement, Mr. Burkle was required to make the

---

[32] Needless to say, given the vagaries of available proof, the parties to a dissolution proceeding who hope to reconcile and at the same time resolve property issues in a postmarital agreement would be well advised to dismiss the proceeding before executing an agreement. Dismissal will avoid the uncertainties attendant upon the need to later present sufficient proof that an agreement was executed while the dissolution proceeding was in abeyance and that neither party contemplated the imminent dissolution of the marriage.

[33] Mr. Burkle's request for judicial notice of the certified case history report in the first dissolution proceeding is granted. The report shows the only documents filed in the 1997 case before May and June 2003 (when a substitution of attorney and notice relating to unavailability of counsel were filed, followed by a request for dismissal on June 24, 2003) were the two documents described in the text.

[34] Family Code section 2105 also contains a "good cause" exception to its provisions. (Fam. Code, § 2105, subd. (a).) The trial court found that even if the disclosure declaration requirements applied to this case, good cause would exist to enforce the agreement without strict compliance because the parties were represented by sophisticated counsel and expert forensic accountants, there was no impediment to investigation, and Ms. Burkle accepted the benefits of the agreement for years before challenging it. In view of our conclusion that section 2105 does not apply, we need not consider the parties' arguments on the "good cause" exception.

first \$5 million payment to Ms. Burkle within 90 days. In her petition, however, Ms. Burkle stated the agreement was "void and unenforceable." Her verified interrogatory answers served August 5, 2003, likewise asserted the agreement was void and unenforceable. Subsequently, by letter from counsel dated September 23, 2003, Mr. Burkle tendered the sum of \$3,584,601 on the first \$5 million payment due, crediting himself with claimed overpayments of \$1,415,399 in respect of his obligation to pay Ms. Burkle \$1 million per year while they continued to live together. Counsel's letter requested immediate written notice if Ms. Burkle's lawyers disputed the calculation or the validity of the tender. Her lawyers responded that the agreement was void and unenforceable; they disagreed with the accounting in Karton's letter, so that even if the agreement were enforceable, the letter was not a valid tender; and "[w]hat your client should do is make a payment to Jan without prejudice to the rights or claims of any party . . . ."

Ms. Burkle argues, as she did to the trial court, that Mr. Burkle's tender was defective and "amounted to a failure of consideration and an anticipatory breach chargeable to Ron, giving Jan an election to rescind," which she later purported to do by letter of January 7, 2004.[35] The trial court concluded that Ms. Burkle had unequivocally repudiated the agreement in her petition for dissolution and her verified responses to interrogatories, excusing any further performance by Mr. Burkle and rendering irrelevant any defect in the payment he tendered. We agree with the trial court.

■ Ms. Burkle contends she did not repudiate the contract, because "[a] mere declaration . . . of an intention not to be bound will not of itself amount to a breach, so as to create an effectual renunciation of the contract . . . ." (*Atkinson v. District Bond Co.* (1935) 5 Cal.App.2d 738, 743 [43 P.2d 867].) Ms. Burkle's verified statements in her petition and interrogatory answers, however, constituted more than a "mere declaration" of intention not to be bound, and she omits reference to the remainder of the principle for which *Atkinson* stands: "To justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal and absolute." (*Ibid.*) In *Atkinson*, a subsequent letter disclaiming any liability under the contract "was tantamount to a distinct, unequivocal and absolute refusal to perform, . . . sufficient to justify plaintiffs in . . . acting thereon as though it were a wrongful renunciation." (*Id.* at p. 744.) We discern no error in the trial court's finding that Ms. Burkle unequivocally repudiated the contract in her dissolution petition and in her discovery responses.

---

[35] Ms. Burkle's January 7 letter stated in part that, "to the extent that the filing of the Petition for Dissolution of Marriage did not constitute notice of rescission under the Civil Code, Janet Burkle hereby formally rescinds the purported agreement entered into as of November 22, 1997, with Ronald W. Burkle."

Ms. Burkle's further contention that, even if she repudiated the contract, Mr. Burkle's subsequent tender somehow "nullified" her repudiation has no merit. "It is well settled that an unequivocal repudiation of the contract by one party prior to material breach of the contract by the other party excuses the other party from tendering performance of his concurrently conditional obligations."[36] (*Kossler v. Palm Springs Developments, Ltd.* (1980) 101 Cal.App.3d 88, 102 [161 Cal.Rptr. 423].) Moreover, Ms. Burkle cites no legal support for the claim that an allegedly defective tender somehow nullifies the other party's repudiation of a contract, and we are aware of none. Indeed, Ms. Burkle's response to the defective tender reiterated her position that the contract was void and unenforceable. Consequently, Mr. Burkle's allegedly defective tender of less than $5 million is, as the trial court stated, irrelevant.

## VI. *Doctrines of ratification and estoppel likewise preclude Ms. Burkle's claim that the postmarital agreement is void and unenforceable.*

In addition to its other conclusions, the trial court observed that Ms. Burkle accepted the benefits she received under the agreement for more than five years before asserting that it was unenforceable based on Mr. Burkle's failure to inform her in writing of the contemplated Food-4-Less/Ralphs merger with Fred Meyer/Hughes and the impact it would have on the community estate. The court continued: "The Court finds that such a delay in raising that issue was unreasonable, and that, by her conduct, [Ms. Burkle] ratified the Agreement and is estopped to deny the validity and enforceability of the Agreement at this late juncture. [Ms. Burkle] waited over five years to complain about any aspect of the Agreement, which is evidence that she felt the Agreement was fair, given the obvious and notorious success of [Mr. Burkle's] post-Agreement ventures."[37] In addition, the court found: "By willingly accepting all of the substantial financial benefits to which she was entitled under the Agreement for more than five years, including but not limited to, accepting the annual payments due thereunder and causing [Mr. Burkle] to provide her with the funds needed for her to purchase a house for herself as provided for therein, [Ms. Burkle] has ratified the Agreement and waived any right to seek to rescind it." Again, we are compelled to agree with the court's analysis.[38]

---

[36] See also Civil Code section 1440: "If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

[37] The trial court also found that the "doctrine of laches bars [Ms. Burkle] from contesting the validity and enforceability of the Agreement on the basis of the circumstances surrounding its negotiation and execution, its performance, and the long delay in raising challenge to the Agreement."

[38] Mr. Burkle argues at length that, because Ms. Burkle did not challenge the trial court's findings on ratification, estoppel and laches in her opening brief, the findings are presumed

 Ms. Burkle argues the doctrines of laches, ratification and estoppel have no application to this case. First, she contends, the trial court's determinations were based solely on her delay in asserting the invalidity of the agreement, and delay is irrelevant when the invalidity of a contract is asserted defensively. She maintains she asserted the invalidity of the agreement, in effect, as a defense to Mr. Burkle's interposition of the agreement in the dissolution action. She then relies on *Cover*, which states the doctrine of laches does not bar a defense of invalidity of an agreement on the ground of fraud, because one who has been defrauded "may abide his time, and when enforcement is sought against him excuse himself from performance by proof of the fraud." (*Cover, supra*, 188 Cal. at pp. 140–141; see also *Styne v. Stevens* (2001) 26 Cal.4th 42, 51–52 [109 Cal.Rptr.2d 14, 26 P.3d 343] [one sued on a contract may urge defenses that render the contract unenforceable, even if the same matters would be untimely if asserted as the basis for affirmative relief].) The short answer to this contention is that Ms. Burkle was not sued on the agreement and is not urging its invalidity as a defense to an action against her, as in *Cover* and *Styne*. She affirmatively asserted the invalidity of the agreement in support of her claim for a division of community property. Moreover, even if she were challenging the agreement defensively, the Family Code now expressly permits the defense of laches in actions in which a spouse asserts a breach of fiduciary duty that impairs community entitlements.[39]

 Further, Ms. Burkle's contention the trial court's determinations were "all based solely on Jan's 'delay' in asserting the invalidity of the [agreement]" is erroneous. The court's findings of ratification and estoppel were expressly premised on her acceptance of the agreement's benefits—including $1 million each year as her separate property—over the course of the five-year period. As *Cover* states, "[t]here might perhaps be much force in [the] contention" that the defendant widow would be estopped from claiming the invalidity of an agreement, under which she accepted benefits, if it were shown that she had discovered the deceased's fraud before his death. (*Cover, supra*, 188 Cal. at p. 146.) In *Cover*, the evidence revealed the widow had no

correct and the issue is forfeited on appeal. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [36 Cal.Rptr.3d 6].) However, since these equitable defenses may not have applied if there had been any merit to Ms. Burkle's contention the agreement was the product of undue influence, and since Mr. Burkle had the opportunity to file a supplemental brief, we exercise our discretion to address the matter on the merits.

[39] Family Code section 1101, subdivision (d)(3), provides that "[t]he defense of laches may be raised in any action brought under this section." Subdivision (a) states that: "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate."

occasion to discover the fraud. In this case, it can scarcely be claimed that Ms. Burkle, like the widow in *Cover*, accepted and retained the benefits of the agreement "in continuing ignorance" (*ibid.*) of the second merger and its effect on the community estate. Ms. Burkle knew her husband was negotiating a second merger; a public announcement of the merger was made two days after she signed the postmarital agreement; and it strains credulity to suggest that she remained "in continuing ignorance" thereafter, given, in the trial court's words, "the obvious and notorious success of [Mr. Burkle's] post-Agreement ventures." In short, even if the doctrine of laches did not apply, the doctrines of ratification and estoppel surely do. (See *Cover, supra,* 188 Cal. at p. 146 [accepting and retaining benefits of an agreement would operate as an estoppel if the person to be estopped "acted with full knowledge of all the material facts and circumstances and with full knowledge of her rights in the premises"]; *Brown v. Rouse* (1894) 104 Cal. 672, 676 [38 P. 507] [essence of ratification is that it is done with full knowledge of the party's rights; "ratification will be strongly presumed against one who has accepted and had the beneficial use of the property or money involved in the transaction"].)[40]

Finally, Ms. Burkle argues that none of the doctrines of laches, ratification or estoppel applies because Mr. Burkle was not prejudiced, as the amounts he paid under the agreement were far less than Ms. Burkle would have been entitled to receive in the absence of the agreement, as her share of the marital accumulations from 1997 to 2003. Ms. Burkle misconceives the applicable principle. As the Supreme Court stated in *Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351 [82 Cal.Rptr. 337, 461 P.2d 617], "[t]he defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains *or* prejudice to the defendant resulting from the delay." (*Id.* at p. 359, fns. omitted, italics added.) In this case, Ms. Burkle plainly acquiesced in the terms of the agreement by accepting its benefits. Moreover, the element of prejudice has no bearing on the issue of ratification.[41]

---

[40] See also *Gedstad v. Ellichman* (1954) 124 Cal.App.2d 831, 834–835 [269 P.2d 661] (judgment affirmed against a wife seeking to void a property settlement agreement based on concealment of community assets; wife was precluded from claiming the agreement was void because a letter showed "such knowledge of the possible defects of the agreement as to put [wife] on inquiry and to require her to act diligently to protect her rights"; trial court's finding of laches, absent a palpable abuse of discretion, is binding on appeal).

[41] In any event, the trial court found that Mr. Burkle detrimentally relied on Ms. Burkle's promises and representations by, "among other things, complying with the Agreement for years and accumulating property with the understanding that under the Agreement it would be his separate property."

Accordingly, the trial court properly found that the doctrines of ratification and estoppel precluded Ms. Burkle from claiming the postmarital agreement was unenforceable.

## DISPOSITION

The order is affirmed. Ronald W. Burkle is to recover his costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied June 12, 2006, and appellant's petition for review by the Supreme Court was denied August 16, 2006, S144723.