Filed 6/21/24 Estate of Williams CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Estate of FAYE A. WILLIAMS, Deceased. | B332108 |
| _____ | |
| FAYE JASMINE WALKER, Petitioner and Respondent, v. MONICA YOUNG, as Administrator, etc., for the Estate of Lorenzo Young, Objector and Appellant. | (Los Angeles County Super. Ct. No. 21STPB06104) |
| _____ | |
| Estate of LORENZO YOUNG, Deceased. | |
| _____ | |
| MONICA YOUNG, as Administrator, etc., for the Estate of Lorenzo Young, Petitioner and Appellant, v. FAYE JASMINE WALKER, Objector and Respondent. | (Los Angeles County Super. Ct. No. 22STPB00924) |

APPEAL from an order of the Superior Court of Los Angeles County, Gus T. May, Judge.  Affirmed.

Signature Law Group and Gregory M. Finch for Monica Young, Objector, Petitioner, and Appellant.

Law Offices of Mark T. Kawa and Mark T. Kawa for Faye Jasmine Walker, Petitioner, Objector, and Respondent.

———————————————

Faye Williams (Faye) and Lorenzo Young (Lorenzo) were married in 1990 and died several months apart in 2021.  Faye had a daughter from a prior marriage; Lorenzo had no children.  Both spouses maintained separate bank and brokerage accounts during the marriage, and each acquired real property to which the other quitclaimed any interest.  When she died, Faye's assets were held by her personal trust; Lorenzo died intestate.

After Faye's and Lorenzo's deaths, the trustee of Faye's trust filed a petition to administer the trust, and Lorenzo's niece, Monica Young (Monica), filed a petition to administer his estate.  Subsequently, Monica filed a petition pursuant to Probate Code section 850 seeking a declaration that all assets held in Faye's name were community property.  Faye's daughter, Faye Jasmine Walker (Jasmine), sought summary adjudication of several issues raised by Monica's petition, seeking to establish that Lorenzo's estate had no rights to five real properties titled in Faye's name.  The trial court granted the motion for summary adjudication, and Monica appealed.[1]

---

[1]  The administration of a trust or estate is a "series of separate proceedings, each of which is intended to be final."

We affirm.  As we discuss, the owner of legal title to real property is presumed to be the legal owner at death.  Because Faye held legal title to the five real properties at the time of her death, the properties were presumptively her separate property.  Alternatively, Jasmine presented undisputed evidence that Lorenzo transmuted any interest in the properties by quitclaiming them to Faye as her sole and separate property.  Finally, Jasmine made a prima facie showing, which Monica did not successfully rebut, that the real property transactions between Faye and Lorenzo did not give rise to a presumption of

---

(*Estate of Callnon* (1969) 70 Cal.2d 150, 156; accord, *Estate of Loring* (1946) 29 Cal.2d 423, 428; *Meyer v. Meyer* (2008) 162 Cal.App.4th 983, 992; see Ross, Cal. Practice Guide: Probate (The Rutter Group 2023) ¶ 3:3 [probate "is a continuous proceeding" which "involves a series of stages, each of which may result in an appealable order or judgment"].)  Thus, a probate court order may be appealable under the Probate Code even if it does not resolve all claims in the action.

The present appeal is taken from an order granting summary adjudication of Monica's petition pursuant to Probate Code section 850, subdivision (a)(2)(D).  That section provides that a personal representative or any interested person may file a petition "[w]here the decedent died having a claim to real or personal property, title to or possession of which is held by another."  As relevant here, Probate Code section 1300, subdivision (k) provides that in proceedings governed by the Probate Code, an appeal may be taken from "the making of, or the refusal to make" an order "[a]djudicating the merits of a claim made under Part 19 (commencing with Section 850)."  The trial court's summary adjudication order denied Monica's Probate Code section 850 petition, and therefore it is appealable pursuant to section 1300, subdivision (k).

undue influence under Family Code section 721.[2]  Accordingly, the trial court properly granted Jasmine's motion for summary adjudication.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Background.

Faye and Lorenzo were married in June 1990.  At the time of their marriage, Lorenzo was 44 years old and Faye was 42 years old.  Faye had an adult daughter from a previous marriage, Jasmine, who has special needs.  Lorenzo had no children.

Before she married Lorenzo, Faye formed Jasmine Centers, Inc., which served developmentally disabled adults.  Faye formed three additional business entities during the marriage:  Crown Medical Building, LLC (Crown Medical), Magic Circle Adult Day Health Care, Inc. (Magic Circle), and Alviso Avenue Trust, LLC (Alviso LLC).  Faye was each entity's sole member or shareholder.

During their marriage, Lorenzo held five bank accounts and one investment account solely in his name.  Faye held at least two bank accounts and three investment accounts solely in her name, and five bank accounts and two investment accounts in the names of her businesses.  The couple did not hold any joint bank or investment accounts.

For at least the 10 years before her death, Faye filed her federal tax return as "married filing separately."

---

[2]     All subsequent undesignated statutory references are to the Family Code.

4

In 2016, Faye created the Faye A. Williams Family Revocable Trust (revocable trust). The trust stated that Faye was making limited provisions for Lorenzo, who was "familiar with the reasons for doing this." It further provided that if Lorenzo outlived Faye, he would acquire a life estate in the couple's residence, and $200,000 would be held in trust for his benefit. The remaining trust assets were to be distributed at Faye's death to the trustee of the Walker-Young Irrevocable Spendthrift Trust for Jasmine's benefit.

## II.    Faye's and Lorenzo's real properties.

### A.    Real property titled in Lorenzo's name.

In 2003, Lorenzo acquired property in Rancho Cucamonga "as his sole and separate property." The same day Lorenzo acquired the property, Faye transferred her interest in it to Lorenzo through an Interspousal Transfer Grant Deed.

### B.    Real properties titled in Faye's name.

During the marriage, Faye acquired four real properties that are the subject of this appeal.[3] They are as follows:

### 1.    The Chanson Drive property.

In January 1996, "Faye Annette Williams, a married woman as her sole and separate property" acquired a property located on Chanson Drive in Los Angeles (Chanson Drive property). The same day, Lorenzo quitclaimed his interest in the

---

[3]    Below, Monica claimed that Lorenzo's estate also had an interest in a fifth property on West 54th Street in Los Angeles (the 54th Street property). On appeal, however, Monica has disclaimed any interest in the 54th Street property.

5

Chanson Drive property to "Faye Annette Williams, a married woman as her sole and separate property." On October 14, 2016, "Faye Annette Williams, a married woman as her sole and separate property" deeded the Chanson Drive property to "Faye Annette Williams, Trustee of" the revocable trust.

### 2. The Prairie Avenue property.

In February 2002, Magic Circle acquired three adjoining properties referred to collectively as the Prairie Avenue property. In August 2003, Magic Circle deeded the Prairie Avenue property to Crown Medical, and in December 2020, Crown Medical deeded the Prairie Avenue property to "Faye A. Williams, Trustee of" the revocable trust. The transfer was made "for no consideration."

### 3. The 10th Avenue property.

On August 25, 2003, "Faye A. Williams, a married woman as her sole and separate property," acquired a property located on 10th Avenue in Inglewood (10th Avenue property). The same day, Lorenzo quitclaimed his interest in the 10th Avenue Property to "Faye A. Williams, a married woman as her sole and separate property." The quitclaim deed stated that the conveyance was "to establish the sole and separate property of a spouse."

In March 2005, Faye deeded the 10th Avenue property to herself as "Faye Annette Williams, a married woman as her sole and separate property." In October 2016, Faye quitclaimed the 10th Avenue Property to Jasmine Centers, Inc., and in December 2020, Jasmine Centers, Inc. deeded the 10th Avenue Property to "Faye A. Williams, Trustee of" the revocable trust.

6

### 4. The Alviso Avenue property.

In September 13, 2016, the superior court approved the sale to Faye of a property located on Alviso Avenue in Los Angeles (Alviso Avenue property). The following month, Lorenzo executed a quitclaim deed for the Alviso Avenue property in favor of "Faye Annette Williams, a married woman as her sole and separate property." Alviso LLC acquired the Alviso Avenue property in December 2016, and in December 2020, Alviso LLC deeded the Alviso Avenue property to "Faye A. Williams, Trustee of" the revocable trust.

## III. The present action.

Faye died in February 2021, and Lorenzo died three months later. Faye is survived by her daughter Jasmine, and Lorenzo is survived by his brother Leonard Young (Leonard) and his niece Monica.

Monica filed a petition to administer Lorenzo's estate, and Joan Jackson (Joan), as successor trustee, filed a petition to administer Faye's trust. The trial court consolidated the two actions.

In January 2022, Monica filed a "Petition to Confirm Trust Assets" pursuant to Probate Code section 850, subdivision (a)(2)(D). Monica alleged that all of Faye's assets were community property that Faye transferred to her trust without Lorenzo's knowledge or permission. Monica sought (1) a declaration that all of the listed assets were community property, and (2) an order directing that Lorenzo's community property share of assets held by Faye's trust be transferred to Lorenzo's estate.

7

## IV.    Jasmine's motion for summary adjudication.

Jasmine moved for summary adjudication in February 2023, seeking a determination that Lorenzo's estate had no interest in the five real properties held by Faye's trust. Jasmine urged that pursuant to Evidence Code section 662, ownership of those properties was dictated by the form in which title was held.  Further, Lorenzo had quitclaimed his interest in four of the properties; the fifth property (the Prairie Avenue property) was acquired by Faye's separately owned corporation, which subsequently transferred it to Faye for no consideration. Finally, Monica had admitted in her discovery responses that Lorenzo was not coerced, under duress, or unduly influenced when he executed the quitclaim deeds.  Accordingly, Jasmine asserted:  "The undisputed facts establish that Faye and Lorenzo deliberately kept their finances separate for their three decades of marriage.  Faye did this because she had an adult daughter with long-term health needs to protect.  Thus, each property Faye purchased, either individually or through one of her wholly-owned companies, was transferred into her Trust for Jasmine's ultimate benefit.  Accordingly, . . . Lorenzo's Estate has no ownership interest in any of them."

In support of the motion for summary adjudication, Jasmine submitted the declaration of Joan, who was Faye's longtime friend and attorney.  Joan stated that from about 2010 until Faye's death in 2021, Joan assisted Faye with her businesses and investments.  Faye told Joan that because of Jasmine's special needs, Faye and Lorenzo had agreed from the outset of their marriage to keep their business and financial affairs completely separate so Faye could ensure that all her

8

assets, which were more substantial than Lorenzo's, would support Jasmine after Faye's death.

Joan said she periodically stayed at Faye's and Lorenzo's home. During those visits, she spoke often with Lorenzo individually, and with Faye and Lorenzo jointly, about their financial affairs. Both spouses said they kept their financial and business affairs separate. More than once, Lorenzo told Joan, " 'Faye's business is Faye's business and I don't have anything to do with it' or words to that effect."

In November 2021, Joan went through every document in Faye's and Lorenzo's home. Based on her review of Faye's documents, Joan determined that Faye wholly owned Crown Medical, Magic Circle, and Alviso LLC. Faye held two bank accounts and three investment accounts solely in her name, and held five bank accounts and two investment accounts in the name of her businesses. There were no bank accounts or investment accounts held jointly by Faye and Lorenzo. For at least the 10 years prior to her death, Faye filed her federal tax returns as "married filing separate."

## V.     Monica's opposition to summary adjudication.

Monica opposed the motion for summary adjudication. She contended: (1) Faye's and Joan's undue influence over Lorenzo overcame the presumption of ownership based on the form in which title was held; and (2) the quitclaim deeds Lorenzo signed were not valid transmutation agreements.

In support of her opposition to summary adjudication, Monica submitted her own declaration, which said that when Faye died, Lorenzo knew he was one-half owner of all marital assets, including residential and commercial real estate and

9

business and personal bank accounts.[4]  After Faye's death, Monica and Lorenzo learned that Faye had executed a will and trust.  Lorenzo was "shocked and confused that all of their marital assets appeared to be in [Faye's trust]."

Monica also submitted the declaration of her father, Leonard, who said he had a close relationship with Lorenzo and Faye, spoke to them weekly, and visited regularly.  Lorenzo and Faye never spoke to Leonard in any detail about their finances.  After Faye's death, Lorenzo was shocked to learn that Faye had executed a will and trust and had put all marital assets in her trust.

## VI.     Order granting summary adjudication.

The trial court granted the motion for summary adjudication.  In its written ruling, the court detailed how each piece of real property was acquired and held, noting that Monica "does not dispute the facts described as to the specifics of the deeds and other documents."  However, because Monica disputed that these assets were Faye's separate property, "whether [Jasmine] has met her prima facie burden to show that there are no disputed issues of material fact as to [Monica's] claim that this property is community property depends on the interplay between Evidence Code § 662 and Family Code § 760 as applied to these facts."  The court explained as follows:

"Under Evidence Code § 662, the 'owner of the legal title to property is presumed to be the owner of the full beneficial title.'  This presumption 'may be rebutted only by clear and convincing

_____

[4]     In the following summary of Monica's and Leonardo's declarations, we omit those portions to which the trial court sustained objections.

proof.' (Evid. Code, § 662.) Under Family Code § 760, '[e]xcept as otherwise provided by statute, all property, real or personal, . . . acquired by a married person during the marriage . . . is community property.' In accordance with *Estate of Wall* (2021) 68 Cal.App.5th 168 [(*Wall*)], the Court finds that Evidence Code § 662's presumption prevails over Family Code § 760 in the factual circumstances of this case. Accordingly, because the evidence demonstrates that [Faye] held legal title to the [five real properties] at the time of her death, she is presumed to be the owner of the full beneficial title, absent clear and convincing proof to the contrary."

"[Monica] next relies on *Wall* to argue that the undue influence of [Faye] and [Joan] overcomes the title presumption in Evidence Code § 662. Although the portion of *Wall* cited by [Monica] is not citable as it was not published, the law is well-established that where one spouse secures an advantage from a property-related transaction between spouses, Family Code § 721 creates a presumption that the advantaged spouse exercised undue influence and the transaction may be set aside. [Citation.] 'The presumption is rebuttable; the spouse advantaged by the transaction must establish that the disadvantaged spouse acted freely and voluntarily, with full knowledge of all the facts, and with a complete understanding of the effect of' the transaction.' *Ibid.*

"Here, [Jasmine] presented sufficient evidence to rebut the presumption by showing that [Faye] and [Lorenzo] kept their finances separate and that both spouses quitclaimed their interest in properties acquired during the marriage. [Monica] has failed to introduce any admissible evidence showing that there is a triable issue of material fact as to undue influence.

11

"Citing *In re Marriage of Kushesh* [&] *Kushesh-Kaviani* (2018) 27 Cal.App.5th 449, [Monica] also argues that [Faye] and [Lorenzo] did not transmute the property from community property to separate property of [Faye] because [Lorenzo] did not sign any express declaration stating that the character of the property was being changed from community property to separate property. The Court is not persuaded. *Kushesh* found that the language in the pertinent deed had sufficient language to properly transmute the property. It did not state that the only way to transmute property is with the particular language set forth in that case. Here, the Court finds that the deed's language is sufficient to constitute a transmutation as explained in *Kushesh*, and is consistent with the primacy of the presumption in Evidence Code § 662."

Monica timely appealed from the order granting summary adjudication.

## VII. Monica's motion for reconsideration.

Monica filed a motion for reconsideration. She asserted that after the probate court granted the summary adjudication motion, she learned that Lorenzo had remodeled the Chanson Drive property and coordinated repair work on Faye's other properties. Further, she had obtained some of Lorenzo's medical records, which showed that Lorenzo had a history of strokes that left him mentally and physically impaired. Monica asserted this new information raised triable issues as to whether Lorenzo was subject to undue influence when he executed the quitclaim deeds.

The trial court denied the motion for reconsideration, concluding that Monica's filing of the notice of appeal deprived the court of jurisdiction to consider the motion.

12

## DISCUSSION

On appeal, Monica contends that the trial court erred by granting summary adjudication because the four properties were acquired during the marriage and were not transmuted from community property to Faye's separate property. Monica further urges that Lorenzo's transfers of property to Faye gave rise to a presumption of undue influence, which Jasmine did not rebut.

Jasmine responds that Evidence Code section 662 creates a rebuttable presumption that the form of title controls in probate, and Monica did not rebut that presumption. Jasmine further contends that, in any event, the quitclaim deeds were valid transmutations, and the trial court correctly concluded that any presumption of undue influence was rebutted by undisputed evidence that Faye and Lorenzo held their property separately throughout their marriage.

As discussed below, we conclude that the properties were presumptively Faye's separate property based on the form of title, and the undisputed facts do not give rise to a presumption of undue influence. We therefore affirm the grant of summary adjudication.

## I.     Standard of review.

We independently review the trial court's order granting summary adjudication. In doing so, we consider all the evidence before the trial court except that to which objections were made and sustained, and we view the evidence in the light most favorable to the nonmoving party. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.) Although our review is de novo, appellant bears the burden of demonstrating error. (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 372;

13

*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [even under de novo summary judgment review, our review is limited to issues adequately raised and supported in appellant's brief].)

In exercising our independent review, we apply the standards applicable to summary adjudication motions. A defendant moving for summary adjudication has an initial burden to make a prima facie showing that one or more elements of the cause of action cannot be established or that there is a complete defense. (Code Civ. Proc., § 437c, subds. (f)(1), (o), (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851.) Once the moving party meets its burden, the burden shifts to the opposing party to show the existence of material disputed facts. (*Aguilar*, at pp. 850–851.) Summary adjudication is properly granted only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

## II. The properties were presumptively Faye's separate property.

### A. The form of title presumption applies in this probate action.

#### 1. Legal principles.

Several different—and facially competing—statutory presumptions are relevant to the issues in this case. Pursuant to Evidence Code section 662, the owner of legal title to property "is presumed to be the owner of the full beneficial title." This form of title presumption "may be rebutted only by clear and convincing proof." (*Ibid.*)

14

Separately, pursuant to section 760, any property acquired by a married person during the marriage is presumptively community property, except as otherwise provided by statute. In contrast, property owned by the person before marriage or acquired by the person after marriage by gift, bequest, devise, or descent is presumptively separate property, as are the rents, issues, and profits of any separate property. (§ 770.) Married persons may, by agreement, transmute community property to the separate property of either spouse, transmute either spouse's separate property to community property, or transmute the separate property of one spouse to the separate property of the other spouse. (§ 850.)

In *In re Brace* (2020) 9 Cal.5th 903, 914 (*Brace*), our Supreme Court considered the interaction of the form of title presumption of Evidence Code section 662 and the community property presumption of Family Code section 760 in the context of a dispute between a married couple and a bankruptcy trustee. At issue in *Brace* was the status of two pieces of real property the couple acquired with community funds. The couple held title to both properties as " ' "husband and wife as joint tenants." ' " (*Id.* at p. 913.) The husband subsequently filed a bankruptcy petition, which his wife did not join. Under the Bankruptcy Code, if the properties were community property, then the entirety of the couple's interests in the properties would become part of the husband's bankruptcy estate; if the properties instead were held in joint tenancy, then only the husband's one-half separate property interest would become part of his bankruptcy estate. (*Ibid.*)

Our Supreme Court held that "when a married couple uses community funds to acquire property with joint tenancy title on

15

or after January 1, 1975, the property is presumptively community property under Family Code section 760 in a dispute between the couple and a bankruptcy trustee." (*Brace*, *supra*, 9 Cal.5th at p. 912.)  The court explained:  "It would carve a major hole in the community property system to hold that Evidence Code section 662, a general statute that addresses the import of legal title—and not Family Code section 760, a statute that specifically addresses the characterization of property acquired during marriage—governs the characterization of property acquired during marriage for all purposes other than divorce." (*Id.* at p. 928.)

The *Brace* court held, however, that a different rule applies in the probate context.  It said:  "[O]ur approach does not undermine the stability of title in the context of probate. . . .  [¶] Courts have consistently held that for property titled in joint tenancy, the form of title controls at death[, and] . . . we see no indication that . . . any subsequent development suggests an intent by the Legislature to disturb the rule that the form of title controls the disposition of joint tenancy property at death." (*Brace*, *supra*, 9 Cal.5th at pp. 931–932.)  The court emphasized: "Our decision today does not alter the well-established default rule that form of title controls at death, nor does it alter the procedures through which a surviving joint tenant may clear title to real property held in joint tenancy." (*Id.* at p. 934.)

In *Estate of Wall* (2021) 68 Cal.App.5th 168 (*Wall*), the Court of Appeal applied *Brace*'s analysis in a probate matter to conclude that the form of title presumption applied at death. There, the decedent had two children from his first marriage. When he remarried, he and his second wife purchased a home, on which decedent made the down payment from his separate

property and took title as " 'Benny M. Wall, a married man[,] as his sole and separate property.' " (*Id.* at p. 170.) After the decedent died intestate, his wife petitioned the court to determine that the home was community property, and the probate court granted the wife's petition. (*Ibid.*) The Court of Appeal rejected the trial court's conclusion that the home was presumptively community property, explaining that under *Brace,* " 'form of title controls at death.' " (*Id.* at p. 175.)[5]

## 2. Analysis.

*Brace* and *Wall* govern the present case. Under those cases, the form of title presumption prevails over the community property presumption in probate matters, and thus ownership of the four properties at issue here presumptively is governed by the form in which title is held.

In support of her motion for summary adjudication, Jasmine submitted evidence that at the time of Faye's death, her revocable trust held title to each of the four properties. While Monica disputed the legal significance of the deeds, she did not challenge their existence or authenticity. Under *Brace* and *Wall*,

---

[5] Notwithstanding this conclusion, the Court of Appeal affirmed the judgment for the wife, concluding in an unpublished portion of the opinion that substantial evidence supported the trial court's conclusion that the evidence gave rise to a presumption of undue influence, which the decedent's children did not rebut. (*Estate of Wall, supra,* 68 Cal.App.5th at pp. 169, 176.)

17

therefore, the properties are presumptively Faye's separate property.[6]

      Citing *Brace*, Monica urges that the properties are not Faye's separate property because the grant deeds' language was insufficient to effect transmutations. Her contention conveys a fundamental misunderstanding of *Brace*. *Brace* considered two related but separate issues. First, the *Brace* court held that for purposes of the bankruptcy dispute before it—but not in the probate context—joint tenancy titling was not sufficient to overcome the Family Code section 760 presumption that the real properties acquired by the couple with community funds were community property. (*Brace*, *supra*, 9 Cal.5th at p. 911.) Second, the court considered, *outside the probate context*, what evidence would be sufficient to overcome the presumption that the debtor's real property was community property. As to that issue, the court concluded that a deed evidencing that a married couple had taken title as joint tenants was not sufficient; instead, "[f]or joint tenancy property acquired with community funds on or after January 1, 1985, a valid transmutation agreement from community property to separate property requires a written declaration that expressly states that the character or ownership of the property is being changed." (*Id.* at p. 938.)

---

[6]     *Trenk v. Sohelli* (2020) 58 Cal.App.5th 1033, on which Monica relies, does not suggest a different result. *Trenk*, like *Brace*, arose in the context of a dispute between a married couple and their creditors, not in probate. Accordingly, *Trenk*'s conclusion that the couple's home was presumptively community property even though the husband and wife held title as joint tenants is not relevant to the present probate action.

18

The present dispute arose in consolidated probate actions initiated after Faye's and Lorenzo's deaths. Under *Brace*, the Evidence Code section 662 form of title presumption, *not* the Family Code section 760 community property presumption, controls in probate. Contrary to Monica's assertion, therefore, the deeds transferring the real properties from third parties to Faye "as her sole and separate property" are sufficient to create a presumption that she held them as her separate property. Because the parcels are presumed to be separate property, transmutation is not at issue.

## B. In any event, the properties were effectively transmuted to Faye's separate property.

Alternatively, even if the form of title presumption did not apply, our conclusion would be the same because there was an effective transmutation of the properties.

### 1. Legal principles.

Section 852 governs transmutation in California. That section provides that a "transmutation"—an interspousal transaction changing the character of community or separate property (*In re Marriage of Begian & Sarajian* (2018) 31 Cal.App.5th 506, 509 (*Marriage of Begian*))—"is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (§ 852, subd. (a).) Thus, transmutation requires three elements: "(1) the transmutation must be made in writing; (2) the writing must contain an 'express declaration' of transmutation; and (3) the writing must be 'made, joined in, consented to, or accepted' by the adversely affected spouse." (*In re Marriage of Kushesh & Kushesh-Kaviani*, *supra*,

19

27 Cal.App.5th at p. 454 (*Marriage of Kushesh*); see also *In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, 1428 [" 'To satisfy the requirement of an "express declaration," a writing signed by the adversely affected spouse must expressly state that the character or ownership of the property at issue is being changed' "].)

*Marriage of Kushesh* considered whether a quitclaim deed executed by a husband in favor of his wife effected a transmutation within the meaning of section 852. There, a deed transferred real property from the seller to the wife, "a Married Woman as Her Sole and Separate Property," and the husband executed an interspousal transfer grant deed stating that the husband "grant(s)" the real property to the wife "as Her Sole and Separate Property." (*Marriage of Kushesh*, *supra*, 27 Cal.App.5th at p. 452.) The Court of Appeal concluded that the interspousal transfer grant deed transmuted the property from community to separate property. It explained: "[N]ot only did the writing use the verb 'grant' . . . but the heading added the words 'interspousal'—denoting a spouse-to-spouse transaction—and 'transfer grant'—denoting that whoever was doing the granting was actually transferring something out of that person's estate. Furthermore, this [interspousal transfer grant deed] unequivocally stated the transfer was to make the property Wife's *as* her sole and separate property, inescapably pointing the reader in the direction of a change in the marital characterization of the property. [¶] We therefore disagree with the trial court that the [interspousal transfer grant deed] did not contain enough 'magic words' to effectuate a transmutation. [Citation.]

20

We do not believe any form of the word 'transmute' is necessary." (*Id.* at pp. 454–455.)[7]

The court applied the same rule to reach a different result in *Marriage of Begian, supra,* 31 Cal.App.5th 506. There, a married woman and her mother executed a grant deed transferring their respective 48 and 52 percent interests in real property to the mother, wife, and husband as joint tenants. Subsequently, the parties executed a "trust transfer deed" stating that the mother, wife, and husband, as joint tenants, "grant to [wife]" the real property. (*Id.* at pp. 509–510.) The wife then created a separate property trust and transferred the real property to herself as trustee. About a year later, the husband filed a dissolution action and asked the court to find that the real property was community property. (*Id.* at pp. 510–511.)

The trial court found the property was the wife's separate property, and this court reversed. We noted that the question was whether the husband's trust transfer deed effectively transmuted his community property interest in the real property to the wife's separate property. (*Marriage of Begian, supra,* 31 Cal.App.5th at p. 511.) As to that issue, we said that "[a]n 'express declaration' does not require use of the terms 'transmutation,' 'community property,' 'separate property,' or any other particular locution," but " 'must *unambiguously* indicate a change in character or ownership of property.' " (*Id.* at p. 512.) We found that the trust transfer deed did not unambiguously indicate a change in character or ownership of the real property

---

[7] Contrary to Monica's assertion, nothing in *Marriage of Kushesh* suggests that "only the language in an interspousal grant deed" meets section 852's requirements.

21

because the conveyance language could reasonably be construed to mean that the husband granted his community interest in the real property to his wife *to be held in trust*, and not to effect a change in the property's marital character or ownership. (*Id.* at p. 513.) In other words, we said, the husband's use of the word "grant" was ambiguous because it "only establishes his intention to transfer an interest in real property, 'without specifying *what interest* was to be transferred.'" (*Id.* at p. 515.) This "ambiguity would have been eliminated by including language in the Trust Transfer Deed specifying that [husband] granted all or any interest he had in [the real property] to [wife], or . . . *by stating he granted* [*the real property*] *to* [*wife*] *'as her sole and separate property.'*" (*Id.* at p. 518, italics added.)

## 2. Analysis.

In the present case, Faye acquired title to three of the properties—the Chanson Drive property, the 10th Avenue property, and the Alviso Avenue property—in her own name, as her sole and separate property. Concurrently, Lorenzo executed quitclaim deeds to those three properties. The quitclaim deeds stated as follows:

*Chanson Drive property*: "For a valuable consideration, receipt of which is hereby acknowledged, [¶], Lorenzo Young, husband of grantee, [¶] hereby remise[s], release[s], and forever quitclaim[s] to [¶] Faye Annette Williams, a married woman as her sole and separate property [¶] the [Chanson Drive property]." The deed further states: "**The real property herein described was purchased with the sole and separate funds of the grantee and is exempt pursuant to R&T 11911.**" (Capitalization omitted.)

22

*10th Avenue property*:  "For a valuable consideration, receipt of which is hereby acknowledged, Lorenzo Young, (husband of the grantee) [¶] hereby remises, releases and quitclaims to Faye A. Williams, a married woman as her sole and separate property [¶] the [10th Avenue property]."  The deed further says:  " 'This conveyance is to establish the sole and separate property of a spouse, R & T 11911.' "  (Capitalization omitted.)

*Alviso Avenue property*:  "For valuable consideration, receipt of which is hereby acknowledged, [¶] Lorenzo Young, a married man, husband of grantee, [¶] hereby remise(s), release(s) and quitclaim(s) to [¶] Faye Annette Williams, a married woman as her sole and separate property, [¶] the real property situated in the County of Los Angeles, State of California, more particularly described as [the Alviso Avenue property]."[8] (Capitalization omitted.)

We conclude that each of these quitclaim deeds was sufficient to effect a transmutation.  First, each of the deeds was in writing and was "made, joined in, consented to, or accepted by" Lorenzo, the adversely affected spouse.  (§ 852.)  Second, each deed contained an "express declaration" of transmutation by stating that Lorenzo remised, released and quitclaimed his interest.  (See Black's Law Dictionary (11th ed. 2019) ["remise" means "[t]o give up, surrender, or release (a right, interest, etc.)" < https://1.next.westlaw.com/Document/

---

[8]    Monica notes that the Alviso Avenue quitclaim deed was not notarized or recorded, but she does not cite any authority to suggest that those facts are relevant to the transmutation issue.

I0344230a808511e4b391a0bc737b01f9/View/FullText.html?transitionType=SearchItem&contextData=(sc.Search)> [as of June 20, 2024], archived at <https://perma.cc/T5BD-KEJS>].) As in *Marriage of Kushesh* and *Marriage of Begian*, therefore, each deed clearly stated that Lorenzo was "giving" or "granting" any interest he had in the subject properties to Faye. Third, each deed expressly stated that the effect of the transfer was to make the property Faye's *sole and separate property*. Unlike *Marriage of Begian*, therefore, there was no ambiguity in the deed language here as to " '*what interest* was to be transferred.' " (*Marriage of Begian, supra*, 31 Cal.App.5th at p. 515.) We accordingly hold, consistent with *Marriage of Kushesh* and *Marriage of Begian*, that the quitclaim deeds to the Chanson Drive, 10th Avenue, and Aliso Avenue properties effectively transmuted them into Faye's separate property.

Our analysis is somewhat different with regard to the Prairie Avenue property. Faye did not purchase that property, but received it as a donative transfer from one of her wholly owned companies. Property obtained by a spouse during marriage "by gift" is presumptively separate property. (§ 770.) Monica does not explain why, under the circumstances of this transfer, the Prairie Avenue property presumptively would be community property or would require a transmutation agreement. Any such contention, therefore, is forfeited. (See, e.g., *Wright v. City of Los Angeles* (2001) 93 Cal.App.4th 683, 689 ["Generally, asserted grounds for appeal that are unsupported by any citation to authority and that merely complain of error without presenting a coherent legal argument are deemed abandoned and unworthy of discussion."]; *Singh v. Lipworth*

24

(2014) 227 Cal.App.4th 813, 817 [appellate contentions forfeited if "unsupported by 'adequate factual or legal analysis' "].)

### III. The trial court correctly concluded that there were no triable issues as to undue influence.

Having concluded that the four properties were presumptively Faye's separate property, we next consider whether the presumption was overcome by evidence sufficient to give rise to a presumption of undue influence pursuant to section 721. As we discuss, it was not.

#### A. Legal principles.

Spouses "may enter into any transaction with the other, or with any other person, respecting property, which either might if unmarried." (§ 721, subd. (a); see also *In re Marriage of Lund* (2009) 174 Cal.App.4th 40, 55.) However, in property-related transactions between spouses, section 721, subdivision (b) " 'imposes a duty of the highest good faith and fair dealing on each spouse . . . .' This duty stems from the 'general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other,' prohibiting each spouse from taking 'any unfair advantage of the other.' (*Ibid*.) Thus, ' "[i]f one spouse secures an advantage from the transaction, a statutory presumption arises under section 721 that the advantaged spouse exercised undue influence and the transaction will be set aside." ' (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 344.)" (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1353 (*Lintz*).) Where it arises, this presumption prevails over the presumption in favor of record title. (*In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, 997–998.)

25

An advantage results to one spouse "when the 'spouse's position is improved, he or she obtains a favorable opportunity, or otherwise gains, benefits, or profits. [Citation.]' (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 629.) The presumption is rebuttable; the spouse advantaged by the transaction must establish that the disadvantaged spouse acted freely and voluntarily, with ' " ' "full knowledge of all the facts, and with a complete understanding of the effect of" the transaction.' " ' (*In re Marriage of Fossum*, *supra*, 192 Cal.App.4th at p. 344.)" (*Lintz*, *supra*, 222 Cal.App.4th at p. 1353; see also *In re Marriage of Lund*, *supra*, 174 Cal.App.4th at p. 55.)

The presumption of undue influence has frequently been applied where one spouse deeded a single piece of property to the other without consideration. (See, e.g., *In re Marriage of Mathews, supra,* 133 Cal.App.4th 624; *In re Marriage of Delaney*, *supra*, 111 Cal.App.4th 991.) In such cases, "it is evident one spouse has obtained an advantage—the deeded property—from the other." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 730 (*Burkle*).) In more comprehensive marital transactions, however, where both spouses obtain advantages from an agreement or transaction, "a presumption of undue influence arises only if the one of the spouses has obtained an *unfair* advantage over the other." (*Id.* at p. 732.)

The Court of Appeal analyzed whether a presumption of undue influence arose in a complex marital transaction in *Burkle*, *supra*, 139 Cal.App.4th 712. There, the spouses separated after more than 20 years of marriage. While considering a reconciliation, the spouses agreed to resolve all financial issues between them with regard to community property valued at more than $60 million. (*Id.* at pp. 718–719.) In brief, the agreement

26

provided that all appreciation and income from the community property accruing after the date of the agreement would be the husband's separate property, and the wife would receive $1 million for each additional year the parties lived together, which would be deemed her share of the appreciation and income from the community assets and would be her separate property upon receipt. (*Id.* at p. 719.) If either party sought a divorce, the wife would be awarded $30 million, and the husband would buy her a residence of her choice and would pay all family living expenses at the marital standard of living. (*Id.* at pp. 719–720.) The spouses lived together for several years after executing the agreement; ultimately, however, the wife filed for divorce and sought to set aside the agreement as procured by undue influence. (*Id.* at pp. 722–723.) After a trial, the trial court found the wife signed the agreement freely and voluntarily. (*Id.* at p. 724.) She appealed. (*Id.* at p. 728.)

The Court of Appeal affirmed. While it noted that a presumption of undue influence arises whenever spouses enter into an agreement by which one party gains an advantage, it concluded that in a comprehensive transaction between spouses, "the 'advantage' which raises a presumption of undue influence . . . must necessarily be an *unfair* advantage." (*Burkle, supra,* 139 Cal.App.4th at p. 730, italics added.) In the case before it, the court found no presumption of undue influence arose because "the parties obtained mutually agreeable advantages." (*Id.* at p. 735.) It explained: "A presumption of undue influence cannot logically be applied in a case where benefits are obtained by both spouses . . . ." (*Id.* at p. 736.)

27

## B.    Analysis.

In support of her motion for summary adjudication, Jasmine presented the following evidence:

● Faye told her friend Joan that because of Jasmine's special needs, Faye and Lorenzo had agreed from the outset of their marriage to keep their business and financial affairs completely separate.  Lorenzo, too, told Joan on more than one occasion that he and Faye kept their financial and business affairs separate.

● Both spouses came into the marriage with separate property assets, and they maintained separate bank accounts and investment vehicles throughout their long marriage.  The couple did not hold any jointly titled bank or investment accounts, and they filed separate tax returns for at least a decade prior to their deaths.

● During the marriage, Lorenzo acquired a piece of real property in his name alone, and Faye acquired five pieces of real property in her name alone.  Faye relinquished any interest in the property acquired by Lorenzo, and Lorenzo quitclaimed any interest in four of the five properties acquired by Faye.

● In response to interrogatories, Monica stated that she had "no information upon which to make any contention" about whether Lorenzo was coerced or under duress or undue influence when he quitclaimed his interest in the properties acquired by Faye.

Jasmine's evidence satisfied her initial summary adjudication burden to demonstrate the absence of a triable issue as to whether a presumption of undue influence arose.  Jasmine's evidence was sufficient to support the conclusion that Faye and Lorenzo agreed before their marriage to keep their assets

28

separate so that Faye could provide for her special needs daughter if Faye predeceased her. Faye and Lorenzo acted consistently with this agreement, holding all of their bank and investment accounts separately, and relinquishing any right to real property acquired by the other. While Faye unquestionably benefitted from this agreement, holding five parcels of real property, several businesses, and bank and investment accounts in her name, Lorenzo also benefitted from the agreement, holding a parcel of real property, five bank accounts, and one investment account solely in *his* name. Jasmine therefore made a prima facie case that, as in *Burkle*, both parties obtained advantages from the agreement.

In opposition to the motion for summary adjudication, Monica did not submit any evidence suggesting that Faye obtained "an *unfair* advantage as a result of the [marital] agreement." (*Burkle*, *supra*, 139 Cal.App.4th at p. 736, italics added.) Specifically, Monica did not submit any evidence regarding the value of each spouse's separate property at the inception of the marriage, the relative values of the real properties acquired during the marriage, or the relative values of each spouse's marital investments. Accordingly, there is no evidence from which the trial court could have concluded that Monica raised a triable issue that Faye obtained an "unfair" advantage as a result of the marital transactions.

Alternatively, if a presumption of undue influence arose, Jasmine's evidence was sufficient to rebut it. As noted above, the presumption of undue influence is rebutted if the spouse advantaged by the transaction establishes that the disadvantaged spouse acted freely and voluntarily, with knowledge of the relevant facts and an understanding of the

effect of the transaction. (*Lintz*, *supra*, 222 Cal.App.4th at p. 1353.) Here, Jasmine's evidence suggested that over the course of their 30-year marriage, the spouses acted consistently with the marital agreement described by Joan—that is, both maintained their own separate bank and investment accounts, and they each promptly quitclaimed any interest in real property acquired by the other. Their mutual, repeated conduct over an extended period of time give rise to an inference that each acted with full knowledge and understanding of the relevant facts.

In her opposition to the motion for summary adjudication, Monica did not submit any direct evidence that the transactions between Faye and Lorenzo resulted from Faye's alleged undue influence over Lorenzo. To the contrary, Monica acknowledges on appeal that she "has not the knowledge to establish that Lorenzo . . . was subject to undue influence by Faye." This concession is conclusive of her undue influence claim.

In any event, Monica's evidence does not create a triable issue as to Lorenzo's knowledge or understanding of the relevant transactions. Monica attempted to demonstrate through her and Leonardo's declarations that, shortly before his death, Lorenzo believed he and Faye jointly owned their "marital property." The trial court sustained objections to significant portions of both declarations; and although Monica contends on appeal that Lorenzo's statements to her and Leonardo are admissible pursuant to Evidence Code section 1261, her entire contention in this regard consists of two paragraphs in which she quotes the statutory language and a portion of her declaration. Because she provides no case authority or legal analysis to support her

suggestion that Evidence Code section 1261 applies in the present case, her claim is forfeited.[9]

On the merits, the statements excluded by the trial court do not appear to be admissible under Evidence Code section 1261. Subdivision (a) of that section provides: "Evidence of a statement is not made inadmissible by the hearsay rule *when offered in an action upon a claim or demand against the estate of the declarant* if the statement was made upon the personal knowledge of the declarant at a time when the matter had been recently perceived by him and while his recollection was clear." (Italics added.) Lorenzo's hearsay statements were not offered in "a claim or demand *against* [his] estate," but instead were offered in support of his *own* claim against Faye's estate. They thus are not admissible pursuant to Evidence Code section 1261.

Finally, the portions of the declarations the trial court admitted do not raise a triable issue as to undue influence. They state that after Faye's death, Lorenzo believed he owned half of "all marital assets including residential [and] commercial real estate" and was "shocked and confused that all of their marital

---

[9]	Monica also asserts that the excluded portions of the declarations are admissible under Evidence Code section 1250. Monica did not make this contention below, and thus she has forfeited it on appeal. (See, e.g., *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [" ' " '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived' " ' "].)

assets appeared to be in [Faye's trust]." At most, these statements suggest that shortly before his death, after suffering strokes that affected his memory and cognition, Lorenzo believed that some unidentified "marital property" was held as community property. This evidence did not raise a triable issue as to undue influence because it did not suggest that Faye and Lorenzo had not entered the marital agreement described by Joan, that Lorenzo was confused about the effect of signing quitclaim deeds *at the time he executed them*, or that Lorenzo believed at any time that the real properties that were the subject of the motion for summary adjudication were jointly held. The trial court thus did not err in granting the motion for summary adjudication.

## DISPOSITION

The order granting summary adjudication is affirmed. Respondent is awarded her appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

ADAMS, J.